# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE No.: | 2018AP942-CR |

| | |
|---|---|
| COMPLETE TITLE: | State of Wisconsin, Plaintiff-Respondent-Cross Petitioner, v. Robert Daris Spencer, Defendant-Appellant-Petitioner. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 397 Wis. 2d 241, 959 Wis. 2d 241
(2021 – unpublished)

| | |
|---|---|
| OPINION FILED: | July 6, 2022 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | March 2, 2022 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Milwaukee |
| JUDGE: | Stephanie Rothstein |

JUSTICES:

REBECCA GRASSL BRADLEY, J., delivered the majority opinion of the Court, in which ZIEGLER, C.J., ROGGENSACK, and HAGEDORN, JJ., joined. ANN WALSH BRADLEY, J., filed a dissenting opinion, in which DALLET and KAROFSKY, JJ., joined. DALLET, J., filed a dissenting opinion, in which KAROFSKY, J., joined.

NOT PARTICIPATING:

ATTORNEYS:

For the defendant-appellant-petitioner, there were briefs filed by *John J. Grau* and *Grau Law Office*, Waukesha. There was an oral argument by *John J. Grau*.

For the plaintiff-respondent-cross petitioner, there were briefs filed by *Kara L. Janson*, assistant attorney general, with whom on the briefs was *Joshua L. Kaul*, attorney general. There was an oral argument by *Kara L. Janson*.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2018AP942-CR
(L.C. No. 2014CF5088)

STATE OF WISCONSIN : IN SUPREME COURT

**State of Wisconsin,**

    **Plaintiff-Respondent-Cross Petitioner,**

    **v.**

**Robert Daris Spencer,**

    **Defendant-Appellant-Petitioner.**

**FILED**

**JUL 6, 2022**

Sheila T. Reiff
Clerk of Supreme Court

REBECCA GRASSL BRADLEY, J., delivered the majority opinion of the Court, in which ZIEGLER, C.J., ROGGENSACK, and HAGEDORN, JJ., joined. ANN WALSH BRADLEY, J., filed a dissenting opinion, in which DALLET and KAROFSKY, JJ., joined. DALLET, J., filed a dissenting opinion, in which KAROFSKY, J., joined.

REVIEW of a decision of the Court of Appeals. *Affirmed in part, reversed in part.*

¶1 REBECCA GRASSL BRADLEY, J. This is a review of an unpublished decision of the court of appeals[1] affirming in part and reversing in part the circuit court's[2] denial of a

---

[1] State v. Spencer, No. 2018AP942-CR, unpublished slip op. (Wis. Ct. App. Mar. 9, 2021).

[2] The Honorable Stephanie Rothstein, Milwaukee County Circuit Court, presided.

postconviction motion. Following a jury trial, Robert Daris Spencer was convicted of one count of felony murder and one count of felon in possession of a firearm. After the close of evidence—but before deliberations—the circuit court met in chambers with a juror who had become ill, without counsel present. Upon determining the juror would not be able to continue serving, the judge dismissed the juror for cause.

¶2 Spencer filed a postconviction motion asserting the judge's ex parte contact with the juror violated his Sixth Amendment right to counsel and claiming his counsel was ineffective for failing to object to hearsay testimony. The circuit court denied the motion without an evidentiary hearing. Spencer appealed, raising due process and equal protection challenges to the juror's dismissal in addition to the Sixth Amendment and ineffective assistance claims. The court of appeals affirmed the denial of his motion, concluding Spencer forfeited his due process and equal protection claims and any error implicating the Sixth Amendment was harmless, but reversed and remanded on the ground that Spencer was entitled to an evidentiary hearing on the ineffective assistance claim.

¶3 Before this court, Spencer argues the judge's ex parte meeting with the juror violated his Sixth Amendment right to counsel, the judge's dismissal of the juror violated his equal protection and due process rights and constituted an erroneous exercise of discretion, and he was entitled to an evidentiary hearing on his claim that counsel's failure to object to hearsay testimony constituted ineffective assistance of counsel. The

2

State cross-petitioned on the evidentiary hearing decision, arguing <u>Sholar</u>[3] does not mandate a hearing if the record conclusively shows the defendant is not entitled to relief.

¶4 We hold the judge's meeting with the ill juror was not a critical stage of the proceedings at which the right to counsel attached, and even if there were an error, it was harmless. Accordingly, we affirm the court of appeals on this issue.[4] We reverse the court of appeals' decision to reverse the circuit court's denial of an evidentiary hearing. If the record as a whole conclusively demonstrates the defendant is not entitled to relief, an evidentiary hearing is not mandatory.

---

[3] <u>State v. Sholar</u>, 2018 WI 53, 381 Wis. 2d 560, 912 N.W.2d 89.

[4] Before the court of appeals, in addition to his Sixth Amendment and ineffective assistance claims, Spencer also alleged the circuit court erroneously exercised its discretion by dismissing the juror over Spencer's objection, in violation of his Fourteenth Amendment right to due process and equal protection. The court of appeals determined Spencer forfeited his claims relating to the dismissal of the juror because he "failed to raise them below, either by objecting at the time of trial or by addressing them in his postconviction motion." <u>Spencer</u>, No. 2018AP942-CR, at ¶¶11-12. We agree and conclude Spencer forfeited his claims relating to the dismissal of the juror. See <u>State v. Caban</u>, 210 Wis. 2d 597, 604, 563 N.W.2d 501 (1997) ("The general rule is that issues not presented to the circuit court will not be considered for the first time on appeal. . . . [E]ven the claim of a constitutional right will be deemed waived unless timely raised in the circuit court.") (citations omitted). At trial, defense counsel moved for a mistrial and renewed a <u>Swain</u> objection, but Spencer's postconviction motion neither mentioned the <u>Swain</u> objection nor argued the juror's dismissal was an erroneous exercise of discretion or a violation of Spencer's due process or equal protection rights. See <u>Swain v. Alabama</u>, 380 U.S. 202 (1965).

See State v. Ruffin, 2022 WI 34, ¶3, __ Wis. 2d __, 974 N.W.2d 432. The circuit court properly exercised its discretion in denying an evidentiary hearing under this standard and the court of appeals erred in reversing that decision.

## I. BACKGROUND

### A. The Incident and the Trial

¶5 The State charged Spencer with one count of felony murder and one count of possession of a firearm by a felon for his involvement in an armed robbery resulting in the death of his accomplice, T.M. On the night of the crime, police officers responded to reports of a shooting in Milwaukee, where they found the victim lying face down and observed a number of bullet holes and shell casings, later determined to be from two different guns. The exchange of gunfire on the night of the incident was confirmed by neighbors, ShotSpotter, and officers at the scene, and forensic evidence indicated there were two shooters.

¶6 At trial, the State's theory was that Spencer had a debt to settle with R.S., a friend of Spencer and T.M. The State contended that Spencer and T.M. approached R.S. as he stood outside a residence, and Spencer, armed with a firearm, robbed R.S. by grabbing him and "go[ing] through his pockets, tak[ing] money, tak[ing] his cell phone." As R.S. broke away and began running, the State asserted Spencer shot at R.S. as "a second person with a firearm" located "right in front of the residence or out, or inside the residence shooting from a

4

window" began to return fire "to protect [R.S.]." As a result of this exchange of gunfire, T.M. was shot and killed.

¶7 The State relied on witness testimony from Lerone Towns, a tow truck driver who testified he received a call for a tow that night from a Mr. Green. He testified that when he reached the vehicle pickup location, he encountered an individual, later identified as R.S., waiting in a vehicle behind the one to be towed. R.S. arranged for the vehicle to be towed to a house on the corner of 23rd and Townsend. Upon arriving at the drop-off location, Towns testified he spoke with R.S. about writing his receipt and entering his information into the company system. According to Towns, R.S. said he had to get the money for the payment, and "went straight to the back door," where he stood "for some amount of time." While Towns was taking down information about the vehicle, he said he "turned around, heard somewhat of a commotion at the back door," and saw "two gentlemen standing in front of [R.S.]" with their backs turned toward Towns. He did not see their faces, but stated "one of the individuals was lighter skinned than the other one" and they both appeared to be males. He testified that "the lighter complected gentleman" pulled out a handgun and proceeded to "reach into [R.S.'s] pockets," and "proceeded to grab [R.S.] by the back of his shirt and drug him across the street, across Townsend in front of the residence on 23rd Street." After "between 20 seconds to a full minute," Towns testified "there was nothing but gunfire after that" but he "did not see anyone shooting." He saw R.S. run past him, and testified the gunfire

5

stopped "once [R.S.] got pretty much to the alley." Towns said he then left——with the vehicle still attached to his truck——and received a call en route from R.S. to drop the vehicle off at a different location, where R.S. arrived with the individual identified as Mr. Green to pick it up.

¶8 In addition to Towns' testimony, the jury heard from R.S., who said he knew T.M. and Spencer——identified as "D or D-Dog." R.S. testified he and Spencer "were involved in business together," and he owed Spencer $5,000. R.S. testified that he heard Spencer was looking for him because he had not paid this debt.[5] R.S. also identified Mr. Green as his friend, Errion Green-Brown. R.S. said he lived at the residence where the incident occurred, along with Green-Brown and another individual he identified as Danny McKinney. R.S. testified that McKinney was present "in the upper unit of the residence" at the time the tow truck arrived.

¶9 R.S. confirmed he was robbed by two individuals, T.M. and a "lighter complected" individual whom he "couldn't recognize." R.S. noted the second individual had a firearm and asked R.S., "Where is the money at?" R.S. testified the individuals then "[w]ent in [his] pockets," took a cell phone and a "couple dollars," "snatched [him] up" by his shirt, and dragged him across the street toward a gold mini-van. The

---

[5] Although initially R.S. agreed he told the detective he "never paid that debt," on cross-examination he confirmed he "had already paid Mr. Spencer $3,000." R.S. acknowledged later that "[t]he amount of the debt wasn't the same in each of the interviews" with the detectives.

6

investigation revealed Spencer's fingerprints on the van, and a traffic citation and receipt in Spencer's name were found inside the van.   Forensic evidence demonstrated one of the shooters shot from the residence and the other shooter was near the gold mini-van, in the area where T.M.'s body had been found.

¶10 During his testimony, R.S. acknowledged he had identified Spencer as the second individual to the detectives during three separate interviews.  Additionally, R.S. identified Spencer as the second individual to others——even before he told the detectives.  He told "one of [his] girlfriends it was a person by the name of Spencer, who may be involved but not actually with a gun."  Two of T.M.'s sisters also testified regarding the incident.  One sister, K.G., testified she had dinner with both T.M. and Spencer on the night of the robbery. She said they left together hours before the shooting, in the same van later found at the scene of the crime.  Another sister, Q.G., testified that R.S., prior to his interview with the detectives, told her Spencer was involved in the robbery.  She said she called R.S. shortly after T.M. died, and when R.S. returned her call, he told her "D'Dog" was responsible.  Q.G. denied that she knew who D'Dog was.  She testified R.S. told her T.M. and D'Dog "pulled up in a van and D'Dog and [T.M.] got out [of] the van.  [T.M.] stood a little further off away from them with his hands behind the back and his head down and said D'Dog walked up to him and grabbed him by his shirt with a gun and told him . . . you're going to die today and tried to drag him down the street."  Q.G. recounted that she "asked [R.S.] would

7

he tell that same story to detectives and he said yes," and that she called the detectives immediately after her phone call with R.S. and told them what he had said. During his testimony, R.S. denied that he told Q.G. that D'Dog was involved; instead, he said she told him "it was D-dog." The prosecutor summed up:

Q: So, just so I'm clear, you told detectives that it was D-Dog because you felt threatened. Correct?

A: Yes.

Q: You told one of your girlfriends it was a person by the name of Spencer, who may be involved but not actually with a gun. Correct?

A: Yes.

Q: And you told [Q.G.] that, who the robbers were, but you don't remember saying it was D-Dog?

A: She told me it was D-Dog.

¶11 At trial, numerous discrepancies surfaced between the story R.S. provided to detectives and his trial testimony. Detectives interviewed R.S. three times about the incident, during which R.S. identified Spencer as the other individual with T.M. R.S. changed his story at trial, saying he "couldn't recognize" the individual with T.M. R.S. admitted he had previously identified Spencer, or "D-Dog," and that he told the detective "Spencer walked up and stated, Where is the money at," took $400 from him, grabbed him by his collar and told him "[c]ome with me, you are going to die," and "pull[ed] out a dark gray large semi-automatic handgun from his left side and point[ed] it at [R.S.]" He also testified that he remembered telling the detective Spencer dragged him across the street

8

toward a gold mini-van, and he broke away because he thought the men were going to put him in the van. R.S. recounted that as he ran away, "[s]hots were fired," and he remembered telling the detective Spencer raised his firearm and fired one shot at him, and he heard more gunshots as he ran. R.S. claimed Danny told him afterward he "was firing from the residence in an attempt to protect [R.S.]." R.S. testified he did not call T.M. because he was "scared because [T.M.] was with [Spencer]."

¶12 To explain the discrepancies, R.S. stated, "[the detectives] threatened me if I didn't cooperate, they would lock me up and charge me with the crime." R.S. explained he used Spencer's name because "[t]he detectives told me if I didn't give up Mr. Spencer they would charge me with the crime." R.S. reiterated throughout his testimony that he had "no idea who the individual was" and he "couldn't recognize him." R.S. also admitted he lied to detectives about Green-Brown being at the second location, because Green-Brown "was on probation" and he "didn't want to get him involved." He also said he was not "at first up front about Danny McKinney telling [him] he had fired to protect [him] as [he] ran away." Additionally, R.S. stated he "didn't go to the back door to get money for the tow truck driver" because he had money in his pocket.[6] Earlier in his testimony, however, R.S. indicated the two men took a "[c]ouple dollars" from his pockets, which again conflicted with both his

---

[6] Earlier in his testimony, R.S. said he "went in the house . . . to use the bathroom."

9

testimony that he had enough money in his pocket for the tow truck driver and his statement to the detective that the men took $400 from him.

¶13 The detective who conducted the first interview testified he never threatened R.S. into disclosing Spencer's involvement, and that R.S. provided the names of the individuals who robbed him.  Throughout the detective's testimony, portions of his interview with R.S. were played for the jury.  In response to the prosecutor's questioning about whether the story R.S. gave to the detectives was true, R.S. explained:

> A:  I didn't say it's not true.  I never said it ain't true.
>
> Q:  So, you did hear, you did see the defendant put a gun in your stomach tell you you were going to die and shoot at you?
>
> A:  I didn't recognize the second person, but that is what happened.
>
> Q:  So, everything is true, except for the identity of the defendant as being the person who did all this?
>
> A:  Yes.
>
> Q:  Just so we are clear, a guy you owe money to?
>
>  . . .
>
> A:  Yes.

### B.    The Judge's Meeting with Juror 2

¶14 On the fifth and last day of trial, which began at 8:59 a.m., a discussion about jury instructions was interrupted by a bailiff informing the judge that Juror 2 was ill.  The record reflects the court took a 45-minute recess, during which

10

the judge sent Juror 2 to the judge's chambers to rest. The judge met with Juror 2 in her chambers, without counsel or the defendant, but "conferred with the attorneys" outside of the courtroom. Following the meeting, at 10:05 a.m., the judge went back on the record to explain what had transpired:

> It's been over a half an hour at least, maybe 45 minutes, since we went off the record earlier. The Court went off the record because I was advised that we had a juror who was not feeling well. And when I inquired and with the assistance of one of the bailiffs, we had the juror come out of the jury room, go into my chambers where there's a quiet place for her to rest to see whether she would be feeling better.
>
> She is not feeling well enough to proceed. And when I asked her about 15, 20 minutes ago if she thought she would feel well enough to proceed in any particular length of time, her answer was very tentative and she said unlikely basically and she didn't know how long she would need before she could participate. She is, if you want to know the details, queasy, light headed, just unwell generally.
>
> I did inquire. She said she's been having some health issues as of late and believes that these are——her words——"the reminisce" of some health issues that have been going on I think last week.

¶15 Although counsel was not in the room for the judge's interactions with Juror 2, the judge relayed at least one question from counsel. The judge described the juror's response while documenting her handling of the situation:

> I conferred with the attorneys. We met in the back. I advised the attorneys going along what was the cause for the delay and what was being done to assist the juror and we agreed to wait and we've now waited a significant period of time. And I have to be mindful that we have the remaining 12 sitting back in the jury room waiting to move forward.

11

> I understand the significance of this for both sides, frankly. This is the only African-American juror on the panel. But I am not prepared to put her health at risk by having her continue and go to deliberations when she is so unwell. After we met, the defense asked a question for purposes of the record which I do not find inappropriate. I did ask——I inquired along the lines of the concern that the defense had. I asked the juror if her stress or her not being well enough to proceed had anything to do with her service as a juror or with the behavior of any of the other jurors. Her response to me was "Oh, no. This has nothing to do with the trial." So I'm satisfied with that response. I've made my record.

Additionally, the judge noted, "the remainder of the jurors already were aware [the] juror was not feeling well, that she had been laying down . . . in the jury room. She had been resting in there before she was excused to chambers. So they're aware of the situation. They're aware that it's regarding her health."

## C. The Dismissal of the Juror

¶16 After meeting with the juror and explaining the nature of that meeting on the record, the judge provided opportunity for counsel to bring motions on the dismissal. The judge explained, "At this point I will tell you I have resolved that we will go forward with the 12. I understand that each of you——one of you might have some motions to bring and I'll allow you to state your positions succinctly for the record[.]" The prosecutor requested the juror be struck "for cause," which the circuit court granted. Defense counsel moved for a mistrial and renewed her Swain challenge, both of which the judge denied.[7]

---

[7] Defense counsel had argued in a pretrial motion that Milwaukee County's procedure of using driver's licenses to

The trial proceeded with the 12 remaining jurors. The jury returned a guilty verdict on each count.

### D. Spencer's Postconviction Motion

¶17 Spencer filed a postconviction motion arguing the circuit court violated his Sixth Amendment right to counsel by interviewing the juror ex parte and maintaining trial counsel was ineffective for failing to object to the meeting with the juror and failing to object to hearsay testimony. Regarding the hearsay testimony, Spencer asserted R.S. "told the police that Mr. McKinney had told him that he, Mr. McKinney, had been shooting to protect [R.S.]" and that the testimony was used "to prove the truth of the matters asserted" because it was used "to show that Mr. McKinney was shooting to protect [R.S.]" Spencer claimed this testimony was "key evidence in the State's theory of felony murder."

¶18 The circuit court denied the motion without an evidentiary hearing. With respect to the judge's interactions with the juror, the court concluded it could not find "the juror's health issue which arose in this case prior to closing arguments constituted a critical stage of the proceedings in which the defendant needed assistance with a legal problem and where counsel's presence was essential." The court determined that even if it were error to meet with the juror outside the

---

summon jurors resulted in an unconstitutional racial composition of the jury panel, which in this case consisted of 2 Black citizens on the panel of 35, in violation of Swain v. Alabama, 380 U.S. 202 (1965). The circuit court denied the motion.

presence of the parties, it was harmless because the error did not prejudice Spencer's case or contribute to the guilty verdict. With respect to the hearsay testimony, the court concluded, "even if trial counsel had objected and the testimony was struck, there is simply not a reasonable probability that the defendant would have been acquitted . . . because there was absolute overwhelming evidence of guilt."

### E. Court of Appeals Proceedings

¶19 Spencer appealed the denial of his postconviction motion. With respect to Spencer's Sixth Amendment claim, the court of appeals assumed the circuit court's discussion with the juror violated Spencer's right to counsel, but concluded "any such violation was harmless" because "counsel was still included in the process of deciding what to do in response to the juror falling ill." State v. Spencer, No. 2018AP942-CR, unpublished slip op., ¶19 (Wis. Ct. App. Mar. 9, 2021). The court noted counsel "agreed to wait" while the juror rested, and, upon resuming the record, the circuit court "made the decision, with counsel present, to dismiss the juror for cause," at which point counsel objected and moved for a mistrial. Id. The court further concluded Spencer received "a fair and impartial jury, and the communications cannot be said to have influenced the jury's verdict."[8] Id., ¶21.

---

[8] Judge White concurred in part and dissented in part. Judge White disagreed that the due process and equal protection claims were forfeited. Spencer, No. 2018AP942-CR, at ¶30 n.1 (White, J., concurring/dissenting). She concluded the dismissal of the juror was a critical stage of the proceedings, implicating both due process and the right to counsel, id., ¶33,

14

¶20 Having affirmed the denial of the postconviction motion on the foregoing grounds, the court reversed the order with respect to Spencer's ineffective assistance claim. Id., ¶29. The court remanded for a hearing on this claim, concluding "Spencer alleged sufficient material facts [in his postconviction motion] that would entitle him to relief, and the trial court was required to grant Spencer a Machner[9] hearing." Id., ¶26 (citing State v. Sholar, 2018 WI 53, ¶51, 381 Wis. 2d 560, 912 N.W.2d 89).

¶21 Spencer appealed the affirmance of the circuit court's denial of his postconviction motion. The State cross-petitioned, arguing the case should not have been remanded for a Machner hearing. We granted both petitions for review. We now affirm the denial of the postconviction motion and reverse the decision to remand for an evidentiary hearing.

## II. STANDARD OF REVIEW

¶22 This case requires us to determine whether Spencer had a constitutional right to be represented by counsel during the circuit court's ex parte meeting with the ill juror. We review independently the interpretation and application of

---

and disagreed that the ex parte meeting was harmless error because the court's analysis was "devoid of 'a fact-specific due-process inquiry' that is required to determine if 'the communication between the judge and jury [denied] the defendant a fair and just hearing.'" Id., ¶53 (quoting State v. Alexander, 2013 WI 70, ¶28, 349 Wis. 2d 327, 833 N.W.2d 126).

[9] State v. Machner, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

15

constitutional provisions.  State v. Alexander, 2013 WI 70, ¶18, 349 Wis. 2d 327, 833 N.W.2d 126 (citing State v. Hamdan, 2003 WI 113, ¶19, 264 Wis. 2d 433, 665 N.W.2d 785); see also State v. Chambers, 2021 WI 13, ¶13, 395 Wis. 2d 770, 955 N.W.2d 144 ("This court independently reviews whether deprivation of a constitutional right has occurred." (quoting State v. Jones, 2010 WI 72, ¶23, 326 Wis. 2d 380, 797 N.W.2d 378)).

¶23  We apply a mixed standard of review to the court of appeals' determination that the circuit court erroneously exercised its discretion when it denied Spencer's postconviction motion without holding an evidentiary hearing.  Ruffin, __ Wis. 2d __, ¶26 (citing State v. Allen, 2004 WI 106, ¶9, 274 Wis. 2d 568, 682 N.W.2d 433).  We first independently consider "whether the motion on its face alleges sufficient material facts that, if true, would entitle the defendant to relief." Id., ¶27 (citing Allen, 274 Wis. 2d 568, ¶9).  "Whether the record conclusively demonstrates that the defendant is entitled to no relief is also a question of law we review independently." Id. (citing State v. Sulla, 2016 WI 46, ¶23, 369 Wis. 2d 225, 880 N.W.2d 659).  If the record conclusively demonstrates the defendant is not entitled to relief, the circuit court has the discretion to decide whether to hold a hearing, which we review for an erroneous exercise of discretion.  Id., ¶28.

### III. DISCUSSION

### A.   No Sixth Amendment Violation

¶24  This challenge involves ex parte contact between the circuit court and a juror after the close of evidence but prior

16

to deliberations, concerning the juror's health. Considering both the substance and the timing of the meeting, we conclude the judge's communications with the juror did not violate Spencer's Sixth Amendment rights because the meeting did not constitute a critical stage at which the presence of counsel was required. Trial counsel was present for the court's decision to dismiss the juror, which was made on the record and with counsel's participation. Even if the ex parte meeting were a violation, any error was harmless.

### 1. The ex parte meeting was not a critical stage

¶25 The Sixth Amendment provides, in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. The historical underpinnings of this right are reflected in its "core purpose . . . to assure 'Assistance' at trial, when the accused [i]s confronted with both the intricacies of the law and the advocacy of the public prosecutor." United States v. Ash, 413 U.S. 300, 309 (1973). The United States Supreme Court has accordingly applied a test "call[ing] for examination of the event in order to determine whether the accused required aid in coping with legal problems or assistance in meeting his adversary." Id. at 313.

¶26 The right to counsel attaches "at all critical stages of the criminal process." Iowa v. Tovar, 541 U.S. 77, 80–81 (2004) (citing Maine v. Moulton, 474 U.S. 159, 170 (1985); United States v. Wade, 388 U.S. 218, 224 (1967)). Not every point in the criminal process is a "critical stage"; the

17

constitutional right to counsel has been expanded "only when new contexts appear presenting the same dangers that gave birth initially to the right itself." Ash, 413 U.S. at 311. The United States Supreme Court has identified as critical stages "proceedings between an individual and agents of the State (whether 'formal or informal, in court or out,' . . .) that amount to 'trial-like confrontations,' at which counsel would help the accused 'in coping with legal problems or . . . meeting his adversary.'" Rothgery v. Gillespie County, 554 U.S. 191, 212 n.16 (2008) (citing United States v. Wade, 388 U.S. 218, 226 (1967); Ash, 413 U.S. at 312-13; Massiah v. United States, 377 U.S. 201 (1964)) (internal citations omitted). Points in the process are not critical if "there is minimal risk that [defendant's] counsel's absence at such stages might derogate from his right to a fair trial." Wade, 388 U.S. at 228.

¶27 Wisconsin courts have determined that voir dire, jury instructions, and jury deliberations constitute critical stages at which the right to counsel attaches. See, e.g., State v. Tulley, 2001 WI App 236, ¶¶6, 11, 248 Wis. 2d 505, 635 N.W.2d 807 (voir dire); State v. Mills, 107 Wis. 2d 368, 370, 320 N.W.2d 38 (Ct. App. 1982) (jury instructions); State v. Koller, 2001 WI App 253, ¶62, 248 Wis. 2d 259, 635 N.W.2d 838 (jury deliberations). In Koller, the court of appeals emphasized that "a trial court's communication with a deliberating jury in the absence of . . . defendant's counsel violates the defendant's constitutional right . . . to have counsel at every stage where he or she needs aid in dealing with

18

legal problems." 248 Wis. 2d 259, ¶62 (citing State v. Burton, 112 Wis. 2d 560, 565, 334 N.W.2d 263 (1983), overruled on other grounds by Alexander, 349 Wis. 2d 327)).

¶28 In State v. Lehman, 108 Wis. 2d 291, 301, 321 N.W.2d 212 (1982), we held the circuit court erroneously exercised its discretion by discharging ex parte a juror who became ill during jury deliberations. We decided the case on purely statutory grounds, concluding the discharge of the juror violated Wis. Stat. § 972.02(1) (1979-80), governing the defendant's right to jury trial by twelve persons, and Wis. Stat. § 972.05 (1979-80), governing the process for replacing regular jurors with alternates. Id. at 301 n.6, 318 n.17. Additionally, we detailed the procedure a circuit court must follow before discharging a juror. Id. at 300. The record in Lehman was "totally devoid of any indication" as to the circumstances of the juror's illness and subsequent discharge, including "whether the circuit judge questioned the juror prior to her discharge." Id. at 293-94, 301. Given a deficient record, we declared, "[I]t is the circuit court's duty, prior to the exercise of its discretion to excuse the juror, to make careful inquiry into the substance of the request and to exert reasonable efforts to avoid discharging the juror." Id. at 300. We noted the efforts of the circuit court "depend on the circumstances of the case." Id. Although Lehman did not implicate the Sixth Amendment, and the procedure outlined in that case is not a constitutional requirement, the court's

19

discussion of the nature of jury deliberations provides useful context for our constitutional analysis.

¶29 Removing a juror <u>during</u> deliberations "poses a very difficult question for the fair and efficient administration of justice" because it impedes the deliberative process.  <u>Id.</u> at 307-08.  We explained in <u>Lehman</u>:

> If, during deliberations, a juror is discharged and another substituted, the eleven regular jurors will have had the benefit of the views of the discharged juror while the alternate will not.  The eleven regular jurors will have formed views without the benefit of the views of the alternate juror, and the alternate juror who is unfamiliar with the prior deliberations will participate without the benefit of the prior group discussion.

 <u>Id.</u>  The court of appeals in <u>State v. Avery</u>, 2011 WI App 124, 337 Wis. 2d 351, 804 N.W.2d 216, also addressed the discharge of a juror during jury deliberations.  In <u>Avery</u>, the court assumed it was error for the judge to conduct ex parte communications with the juror.[10]  <u>Avery</u>, 337 Wis. 2d 351, ¶56.  In that case, the sheriff called the judge at his home late in the evening to relay a request from a juror to be excused due to an "unforeseen family emergency" and marital difficulties.  <u>Id.</u>, ¶51.  After this conversation, the judge contacted the special prosecutor and defense counsel, who agreed the judge should speak with the juror and that the juror should be excused if the information could be verified.  <u>Id.</u>  Because the trial judge's discussion

---

[10] The court assumed the ex parte contact violated Avery's constitutional right to be present, but did not provide a detailed analysis on the constitutional claim.  <u>State v. Avery</u>, 2011 WI App 124, ¶56, 337 Wis. 2d 351, 804 N.W.2d 216.

20

with the juror, who was ultimately excused, could not have influenced the remaining jurors——who had no further contact with the excused juror——the appellate court concluded Avery received a fair trial and the error was harmless. Id., ¶58.

¶30 In United States v. Schiro, the Seventh Circuit addressed a judge's ex parte discussion with a juror during the trial.[11] 679 F.3d 521 (7th Cir. 2012). After learning the juror was uncomfortable serving on the jury and observing that she seemed "anxious and even panicky," the judge "met with her in private and asked her whether everything was okay." Id. at 531. Although she confirmed it was, the juror asked follow-up questions——including whether the trial was almost over and whether threats were made against her——which prompted the judge to remove her from the jury. Id. The Seventh Circuit determined counsel's absence from the meeting was not constitutionally problematic:

> Given her anxieties it would not have been a good idea
> to confront her with the defendants' lawyers——that is,
> agents of the defendants; she would have been
> intimidated by their presence. A defendant's interest
> in being present at all stages of his trial is limited
> by the need for orderly administration of criminal
> trials.

Id. (internal citations omitted). The court concluded, however, that "before dismissing her the judge should have told the

---

[11] As in Lehman, the court in United States v. Schiro did not consider whether the meeting was a "critical stage" under the Sixth Amendment; instead, the court determined "[t]he judge's failure to consult the lawyers was thus a harmless error." 679 F.3d 521, 531 (7th Cir. 2012).

21

lawyers about his discussions with her . . . , for they might have suggested that he question her further, albeit outside their presence." Id. (internal citations omitted). The court determined the error was harmless, acknowledging that "[s]he had already answered the essential questions . . . by saying she hadn't been threatened . . . and hadn't discussed her anxieties with the other jurors. What more was there to ask her?" Id.

¶31 Guided by this precedent and having the benefit of a detailed record documenting the judge's communications with the juror as well as counsel, we conclude the judge's meeting with Juror 2 regarding her health did not constitute a critical stage of the proceedings because the meeting (1) occurred prior to deliberations and (2) involved only a discussion of the juror's health and ability to proceed. Both the timing and substance of the communications dictate that counsel's absence did not result in a constitutional violation.

¶32 As to timing, the meeting took place after the close of evidence but before deliberations began. As the circuit court explained, the alternate juror had been present for the trial and had not been excluded from any juror deliberations. Whereas the concerns animating the court's reasoning in Lehman, Avery, and other jury deliberation cases arose from the difficulty in replicating the deliberative process with the substitution of an alternate juror, substitution prior to deliberations does not implicate these problems.[12]

---

[12] Our conclusion is reinforced by Wisconsin's decision not to recognize "alternate" jurors. See Wis. Stat. § 972.10(7)

¶33 As to substance, the judge's conversation with Juror 2 regarding her health was not one in which Spencer "required aid in coping with legal problems or assistance in meeting his adversary." See Ash, 413 U.S. at 313; see also United States v. Gagnon, 470 U.S. 522, 526 (1985) ("[T]he mere occurrence of an ex parte conversation between a trial judge and a juror does not constitute a deprivation of any constitutional right. The defense has no constitutional right to be present at every interaction between a judge and a juror, nor is there a constitutional right to have a court reporter transcribe every such communication." (quoting Rushen v. Spain, 464 U.S. 114, 125-26 (1983) (Stevens, J., concurring in judgment))); Alexander, 349 Wis. 2d 327, ¶22 ("A conference in chambers might well constitute part of the trial depending upon what matters are discussed or passed upon." (quoting Ramer v. State, 40 Wis. 2d 79, 84, 161 N.W.2d 209 (1968)). The record shows the communications centered on the nature of Juror 2's health issues. The juror had been "laying down . . . in the jury room" and was brought to chambers to rest. The judge communicated

(2019-20) ("If additional jurors have been selected under s. 972.04(1) . . . , the court shall determine by lot which jurors shall not participate in deliberations and discharge them."). The legislature repealed the alternate juror provision in 1984 and amended related provisions to instead reference "additional jurors" in order to "promote an attentive attitude and a collegial relationship among all jurors." See 1983 Wis. Act 226, §§ 3-5; Judicial Council Note, 1983, Wis. Stat. § 972.04. This attempt to increase attentiveness and collegiality among all jurors minimizes if not eliminates any consequences of discharging any particular juror before deliberations.

23

Juror 2 was "not feeling well enough to proceed" and she would be "unlikely" to proceed "in any particular length of time." The judge described the "details" of her symptoms as "queasy, light headed, just unwell generally." Additionally, the judge conveyed that Juror 2 "said she's been having some health issues as of late and believes that these are——her words——'the reminisce' of some health issues that have been going on I think last week."

¶34 Spencer contends "there were legal issues to be addressed where trial counsel could have acted on behalf of her client, thus making the ex parte meeting a critical stage in the proceedings." As one example, Spencer says counsel "could have thoroughly explored whether the nature of the juror's illness rose to the level of cause for dismissal, or whether her discomfort might have warranted a request for a continuance for a few hours, if appropriate, or even a day." Spencer asserts counsel "could have thoroughly investigated whether the fact the juror was the lone African-American on the panel contributed to her discomfort."

¶35 We are skeptical of the utility or propriety of this sort of adversarial approach to a juror's health status—particularly because counsel could pose questions through the judge and deliberations had not begun. The judge in fact relayed a question from defense counsel concerning the source of the juror's symptoms. The court stated, "I did ask——I inquired along the lines of the concern that the defense had. I asked the juror if her stress or her not being well enough to proceed

24

had anything to do with her service as a juror or with the behavior of any of the other jurors."  The judge indicated, "Her response to me was 'Oh, no.  This has nothing to do with the trial.'"

¶36 The United States Supreme Court has recognized as "critical stages" those "step[s] of a criminal proceeding" which involve some adversarial confrontation, such as postindictment interrogations, plea hearings, preliminary hearings, and sentencing.  See Schmidt v. Foster, 911 F.3d 469, 480 (7th Cir. 2018); see also Wade, 388 U.S. at 226 ("[T]he accused is guaranteed that he need not stand alone . . . where counsel's absence might derogate from the accused's right to a fair trial . . . .  The presence of counsel at such critical confrontations, as at the trial itself, operates to assure that the accused's interests will be protected consistently with our adversary theory of criminal prosecution.").  The meeting between the juror and the judge in this case was not an adversarial event in which "defense counsel was powerless to prime the pump of persuasion."  United States v. Parent, 954 F.2d 23, 26 (1st Cir. 1992).  Indeed, Juror 2's response does not invite the force of the adversarial process to ferret out an answer that might better serve the defendant's interests.  This juror had been "laying down" in the jury room, the other jurors were aware that she had health concerns, and she told the judge she was "unlikely" to be able to continue.  At least under the facts of this case, when the juror became ill before deliberations and trial counsel was aware of the meeting,

"agreed to wait," and had the opportunity to relay questions, the adversarial process would not serve any proper role. In fact, it may have subjected Juror 2 to more stress and soured her opinion of the criminal justice system. The investigative and adversarial probing of jurors' symptoms——particularly when substitute jurors are available and the deliberative process is not compromised——is far afield of the Sixth Amendment's protections and antithetical to the idea of an orderly courtroom.[13]

2. Trial counsel was present for the decision to dismiss

¶37 Having determined the ex parte meeting between the judge and Juror 2 did not offend the Constitution, we turn to the trial court's decision to dismiss the ill juror——a related but procedurally independent event.[14] In Alexander, we concluded

---

[13] Consistent with the reasons underlying the constitutional protections, as a best practice lawyers should be present if possible. See, e.g. Alexander, 349 Wis. 2d 327, ¶76 n.2 (Ziegler, J., concurring) ("[I]t is a good practice to include defendants and counsel, if possible, when matters arise during trial."); State v. Lehman, 108 Wis. 2d 291, 300, 321 N.W.2d 212 (1982) ("Such inquiry [into the substance of the discharge request] generally should be made out of the presence of the jurors and in the presence of all counsel and the defendant." (emphasis added)). Nonetheless, the deviation from this practice under the circumstances of this case, which for the reasons set forth above counseled against the lawyers' presence, did not rise to a constitutional violation entitling Spencer to a new trial.

[14] At the court of appeals, Judge White dissented based on "Spencer's right to due process and his right to have counsel present during a critical stage in the legal proceeding, namely when a juror selected at voir dire was dismissed for cause before deliberations began." Spencer, No. 2018AP942-CR, ¶33 (White, J., concurring/dissenting). This conflates the judge's ex parte communications with the juror and the judge's decision

26

the defendant "had no automatic constitutional right to be present during the circuit court's in-chambers discussions" with two of the jurors. Alexander, 349 Wis. 2d 327, ¶30. In our discussion on that point, we cited a Third Circuit Court of Appeals case holding "there is no constitutional right for a defendant to be present at a conference in chambers concerning dismissal of a juror." Id., ¶29 (quoting United States v. Provenzano, 620 F.2d 985, 997-98 (3d Cir. 1980)). We emphasized, "[a]ll that the Constitution requires at such a conference is the presence of defense counsel." Id. (citing Ellis v. Oklahoma, 430 F.2d 1352, 1355 (10th Cir. 1970)) (emphasis added). In this case, defense counsel was present "at such a conference" "concerning dismissal of a juror." See id.

¶38 Prior to the discussion on the juror's dismissal, the judge was notified that a juror was feeling ill and laying down in the jury room, had Juror 2 moved to her chambers where there was "a quiet place for her to rest," proceeded to check on Juror 2 in her chambers——meanwhile "conferr[ing]" with counsel who "agreed to wait"——and asked a question on behalf of defense counsel regarding the nature of the illness. That was the extent of the ex parte meeting. After roughly 45 minutes, the judge went back on the record and documented what transpired during her interaction with Juror 2, stated that she decided to dismiss the juror, and invited counsel to make any motions on

_____

to dismiss, which was made on the record while counsel was present and had the opportunity to make motions and object—— which Spencer's counsel did.

27

the issue. This decision to dismiss occurred on the record, in the presence of counsel, and with counsel's participation. That is all the Constitution requires.

## B. Harmless Error

¶39 Even if the judge's meeting with Juror 2 were a critical stage, any Sixth Amendment violation was harmless error. "Ordinarily, the absence of counsel at a critical stage of the trial is not subject to harmless error analysis." State v. Anderson, 2006 WI 77, ¶74, 291 Wis. 2d 673, 717 N.W.2d 74, overruled on other grounds by Alexander, 349 Wis. 2d 327, ¶¶26-29. However, we have held "a harmless error analysis may apply to certain violations of the Sixth Amendment right to counsel" including "when the circuit court has had ex parte communications with the jury." Id., ¶76. In determining whether any error was harmless, "[w]e examine the circumstances and substance of the communication in light of the entire trial[.]" Koller, 248 Wis. 2d 259, ¶62 (citing State v. Bjerkaas, 163 Wis. 2d 949, 957-58, 472 N.W.2d 615 (Ct. App. 1991)). "An error is harmless if there is no reasonable possibility that the error affected the outcome of the trial."[15] Id. (citing Bjerkaas, 163 Wis. 2d at 958).

---

[15] The principal dissent's misplaced emphasis on the record of the ex parte communications fails to properly contextualize Anderson, on which it relies. See Justice Ann Walsh Bradley's Dissent, ¶75 ("In light of the absence of a sufficient record, an appellate court will have great difficulty concluding that the circuit court's erroneous procedure in communicating with the jury was harmless error." (quoting State v. Anderson, 2006 WI 77, ¶81, 291 Wis. 2d 673, 717 N.W.2d 74, overruled on other grounds by Alexander, 349 Wis. 2d 327, ¶¶26-29)). That

28

¶40 This case reflects the practical realities of running a courtroom. "Judges face tough calls in the courtroom each day." Alexander, 349 Wis. 2d 327, ¶77 (Ziegler, J., concurring) (citations omitted). The United States Supreme Court has

---

statement concerned the circuit court's violation of the statutory requirement that "all statements or comments by the judge to the jury or in their presence relating to the case shall be on the record." Anderson, 291 Wis. 2d 673, ¶78 (quoting Wis. Stat. § 805.13(1) (2003-04).

In Anderson, the circuit court responded to two notes from the jury during deliberations——neither of which were in the record and both of which concerned evidence introduced during trial——without consulting counsel. Id., ¶14. After deliberations ended, the court informed counsel of the ex parte communications and "reconstructed from memory" the substance of the contact. Id., ¶15. We determined the lack of a record and the circuit court's decision not to read to the jury testimony it requested be read "combin[ed] 'to contribute to the verdict obtained.'" Id., ¶117. We concluded when ex parte communications occur "during the deliberative phase of a criminal prosecution, the absence of a complete record as to the alleged communications has been held a factor weighing heavily in favor of reversal," because it deprives the appellate court "of an opportunity to make an assessment of the prejudicial effect of the communication." Id., ¶118 n.72 (quoting 43 A.L.R. 4th 410, § 24) (emphasis added). This was particularly so in Anderson, in which "[t]he circuit court could have improperly influenced the jury deliberations, even if such influence was accidental." Id., ¶118. The jury's request to hear the testimony indicated "it had serious doubts about the outcome of the case and wanted to hear the testimony again to determine whether a guilty verdict was appropriate." Id., ¶122. "Combin[ed]" with the lack of a record of the communications, the court could not determine "beyond a reasonable doubt" the errors did not contribute to the verdict. Id., ¶¶117, 123. The same combination of factors is not present in this case: The ex parte communications occurred between the judge and a juror who did not participate in deliberations, and concerned the juror's health but not the case itself. Unlike in Anderson, the judge in this case consulted counsel regarding the court's handling of the situation.

29

observed, "There is scarcely a lengthy trial in which one or more jurors do not have occasion to speak to the trial judge about something, whether it relates to a matter of personal comfort or to some aspect of the trial." Rushen, 464 U.S. at 118. Concluding "that an unrecorded ex parte communication between trial judge and juror can never be harmless error ignores these day-to-day realities of courtroom life and undermines society's interest in the administration of criminal justice." Id. at 119; see also United States v. Bertoli, 40 F.3d 1384, 1399 (3d Cir. 1994) ("While it may have been preferable to have counsel present, . . . we cannot say that [the defendant] was prejudiced by the trial court's decision to conduct the interviews [with the jurors] without counsel present.").

¶41 The State emphasizes that the "specific inquiry" in this case concerns "whether there's a reasonable possibility that counsel's absence during the ex parte discussions affected the outcome of Spencer's trial." We agree with this narrow formulation and conclude any error was harmless. In order to affect the outcome of the trial, counsel's presence at the meeting would have had to result in Juror 2's retention. Because the nature of the discussion concerned Juror 2's health, there is no reason on this record to believe counsel's presence would have had any impact on the juror's ability to proceed. The juror had been laying down in the jury room before being moved to the judge's chambers to rest, felt "queasy, light headed, just unwell generally," and said she was "unlikely" to

30

be able to continue after any particular length of time. The judge relayed defense counsel's question about whether the illness was related to the trial, and Juror 2 responded no. As the Seventh Circuit queried in Schiro, "What more was there to ask her?" Schiro, 679 F.3d at 531.

¶42 Had counsel's presence at the meeting resulted in Juror 2 remaining on the panel, there is no reasonable possibility her retention would have affected the outcome of the trial. Juror 2 was removed prior to deliberations, so the kind of concerns inherent to the deliberative process were not implicated. Spencer cites Hinton v. United States, 979 A.2d 663 (D.C. Cir. 2009), for the proposition that "jurors are not fungible after they have heard the evidence." In Hinton, the D.C. Circuit determined the trial court abused its discretion in removing an empaneled juror. Hinton, 979 A.2d at 692. The court emphasized it was not concluding "the erroneous replacement of an empaneled juror can never be found harmless[.]" Id. at 689, 691-92 ("In many cases, where twelve impartial jurors have voted unanimously to find the defendant guilty beyond a reasonable doubt, we might be persuaded that the erroneously removed thirteenth juror would not have viewed the evidence differently. Thus, for example, we would suppose that if the government's case is strong and there is no reason apparent in the record to think the erroneously removed juror would have dissented, a reviewing court could be satisfied that the juror substitution had no substantial influence on the outcome."). In that case, the court had "some information

31

concerning the removed juror's thoughts about the evidence" based on the juror's "pointed, probing inquiries" of the witnesses. Id. at 692.

¶43 Borrowing the language of Hinton, "this is not such a case." Id. The State's case was strong and there was no indication the discharged juror would have voted to acquit Spencer. Instead, the State's case shows overwhelming evidence of Spencer's guilt. The only fact disputed by R.S. during his trial testimony was whether Spencer was the second individual involved in the robbery. Regarding R.S.'s story, the prosecutor asked, "So, everything is true, except for the identity of the defendant as being the person who did all this?" to which R.S. responded "Yes."

¶44 Despite R.S.'s recantation on the stand of statements he made identifying Spencer during multiple interviews with the police, the jury heard testimony from a series of other individuals placing Spencer at the scene. In addition to telling the detectives Spencer was involved, R.S. told "one of [his] girlfriends it was a person by the name of Spencer, who may be involved but not actually with a gun." T.M.'s sister, K.G., testified she had dinner with both "D-Dog" and T.M. just hours before the robbery and shooting, and that "D-Dog" and T.M. both left together in the same van later found at the scene. Another sister, Q.G., testified R.S. told her after the incident——but before speaking to detectives——that D-Dog was responsible. She said R.S. told her "D'Dog came to his block with [T.M.] and he said he tried to——that they tried to

32

kill. . . . He said they pulled up in a van and D'Dog and [T.M.] got out [of] the van" and "D'Dog walked up to him and grabbed him by his shirt with a gun[.]" She testified that R.S. told her he "pulled away from D'Dog," and "took off running down the street and D'Dog starting shooting at him." Q.G. said R.S. told her he would tell the same story to detectives, and that she called the detectives immediately after her phone call with R.S. Although R.S. testified he identified Spencer to detectives because they threatened him, Q.G.'s testimony indicates he had already told her and had voluntarily agreed to identify Spencer to the detectives. Not only did the detective testify he never threatened R.S., but the interview was recorded and portions of it were played for the jury during the trial.

¶45 Additionally, Towns testified that Green-Brown, who showed up with R.S. after the incident to complete the tow and whom Spencer suggested might be involved, was not one of the individuals he had seen during the robbery. R.S. repeatedly told detectives D-Dog had robbed him, which he acknowledged during his testimony. R.S. also testified he owed Spencer a debt of several thousand dollars, he had heard Spencer was looking for him regarding this debt, and the individual who robbed him said, "Where is the money at?" Detective O'Day testified R.S. told him in the first of these interviews that Spencer "went into his pockets and pulled out $400 in U.S. currency," "grabbed him by the front of his shirt," "pulled out a gun with his left hand and stated, you're going to die," and "drag[ged] him northbound across Townsend to North 23rd Street."

33

He testified R.S. said he realized he was in trouble and began to run when he saw the gold mini-van, he saw Spencer shoot at him once, and he heard seven more gunshots. The report of gunshots was corroborated by multiple witnesses, ShotSpotter, and forensic evidence, which placed Spencer at the scene through fingerprints lifted from the gold van and a traffic citation and receipt in his name found inside the van.

¶46 Given this record, there is no reasonable possibility that trial counsel's absence during the judge's meeting with Juror 2 affected the outcome of the trial. There is no reason to believe counsel would have altered Juror 2's symptoms somehow or asked more probing questions enabling Juror 2 to remain on the panel. There is no reason to believe Juror 2's presence on the panel would have altered the outcome of the trial in the face of overwhelming evidence of Spencer's guilt and with no disruption to the deliberative process.

### C. No Evidentiary Hearing Required

¶47 The court of appeals erred in concluding Spencer was entitled to a Machner hearing on his ineffective assistance claim. See Spencer, No. 2018AP942-CR, at ¶29. The court of appeals' analysis on this issue mirrors the court of appeals' analysis described in State v. Ruffin, decided this term. 2022 WI 34, ¶¶39-41, __ Wis. 2d __, 974 N.W.2d 432. In reversing the court of appeals' decision in Ruffin that the defendant was entitled to a Machner hearing, we reaffirmed the "well-established" standard on this issue: "[A]n evidentiary hearing is not mandatory if a defendant's motion presents only

34

conclusory allegations or if the record as a whole conclusively demonstrates that the defendant is not entitled to relief." Id., ¶¶35, 38.

¶48 As in Ruffin, the court of appeals in this case correctly stated the legal standard for holding an evidentiary hearing. See Spencer, No. 2018AP942-CR, at ¶22; Ruffin, __ Wis. 2d __, ¶40. The court below explained if the postconviction motion states sufficient material facts that, if true, would entitle the defendant to relief, "the circuit court must hold an evidentiary hearing." Spencer, No. 2018AP942-CR, at ¶22 (quoting State v. Allen, 2004 WI 106, ¶¶9, 14, 274 Wis. 2d 568, 682 N.W.2d 433). "'[I]f the [postconviction] motion does not raise facts sufficient to entitle the movant to relief, or presents only conclusory allegations, or if the record conclusively demonstrates that the defendant is not entitled to relief,' a trial court may, in its discretion, deny a postconviction motion without a hearing." Id. (quoting Allen, 274 Wis. 2d 568, ¶9).

¶49 As we emphasized in Ruffin, __ Wis. 2d __, ¶3, "even if the motion alleges sufficient facts, an evidentiary hearing is not mandatory if the motion presents only conclusory allegations or if the record as a whole conclusively demonstrates that the defendant is not entitled to relief." Nevertheless, in both cases "the court of appeals neglected the 'record conclusively demonstrates' analysis." Ruffin, __ Wis. 2d __, ¶41. The court below determined only that Spencer pled facts sufficient to entitle him to a Machner hearing.

35

Spencer, No. 2018AP942-CR, at ¶26 (citing Sholar, 381 Wis. 2d 560, ¶51). The court "thus perform[ed] only half of the required analysis." Ruffin, __ Wis. 2d __, ¶39.

¶50 Applying this longstanding two-step framework, we conclude Spencer is not entitled to a Machner hearing on his ineffective assistance claim because "the record as a whole conclusively demonstrates that [Spencer] is not entitled to relief." Id., ¶3; see also Sholar, 381 Wis. 2d 560, ¶50. The circuit court determined "even if trial counsel had objected and the testimony was struck, there is simply not a reasonable probability that [Spencer] would have been acquitted of the crimes with which he was charged because there was absolute overwhelming evidence of his guilt." We agree. For the reasons set forth in the harmless error analysis above——which does not rely on the challenged hearsay testimony——the record conclusively shows Spencer is not entitled to relief.

## IV. CONCLUSION

¶51 Under the circumstances of this case, the judge's ex parte meeting with Juror 2 did not constitute a critical stage at which the presence of counsel was required. The meeting's timing and substance——the nature of Juror 2's health concerns and her ability to continue, prior to deliberations——did not implicate Spencer's need for "aid in coping with legal problems or assistance in meeting his adversary." Ash, 413 U.S. at 313. The judge informed counsel of the situation, relayed a question from trial counsel, and after this meeting made the decision to dismiss the juror on the record with counsel's participation.

36

We accordingly decline to recognize as a constitutional violation counsel's inability to personally subject the ill juror to a "thorough[] explor[ation]" of the extent and nature of her symptoms in an adversarial setting. Even if the ex parte meeting was error, it was harmless. There is no reasonable probability that counsel's presence at the meeting would have changed the outcome of the trial.

¶52 We further clarify that an evidentiary hearing is not required when "the record as a whole conclusively demonstrates that the defendant is not entitled to relief." Ruffin, __ Wis. 2d __, ¶3; see also Sholar, 381 Wis. 2d 560, ¶50. The record in this case conclusively demonstrates that Spencer is not entitled to relief on his ineffective assistance claim. We reverse the court of appeals decision remanding for an evidentiary hearing.

*By the Court.*—The decision of the court of appeals is affirmed in part and reversed in part.

37

¶53 ANN WALSH BRADLEY, J. *(dissenting).* The Sixth Amendment to the United States Constitution ensures that the accused shall have the assistance of counsel. To this end, the right to counsel attaches at all critical stages of a trial. United States v. Wade, 388 U.S. 218, 224 (1967).

¶54 The issue before the court is whether the circuit court's in chambers, off-the-record communications with an ill juror, resulting in the juror's dismissal for cause, constituted a critical stage of the trial at which the right to counsel attaches. If Spencer did have a right to counsel at the meetings between the circuit court and ill juror, then he is entitled to a new trial unless the State can prove beyond a reasonable doubt that the constitutional error did not contribute to the verdict.

¶55 In disposing of the Sixth Amendment claim, the majority errs in two ways. First, it wrongly separates the circuit court's communications with the juror from the juror's dismissal, concluding that the communications between the circuit court and the juror without counsel present did not constitute a critical stage at which the right to counsel attaches. Majority op., ¶4. Second, it determines that this constitutional error was harmless by overlooking gaps in the record and ignoring the State's burden to prove beyond a reasonable doubt that the constitutional error was harmless. See id., ¶41.

1

¶56 Contrary to the majority, I determine that the circumstances presented here constitute a critical stage of the trial. Spencer's Sixth Amendment right to counsel was violated because his counsel was not present at this critical stage. Additionally, I conclude that, assuming harmless error applies, the State failed to meet its burden to prove beyond a reasonable doubt that this constitutional violation did not contribute to the verdict. Accordingly, I respectfully dissent.[1]

I

¶57 Spencer was charged with one count of felony murder and one count of possession of a firearm by a felon. Majority op., ¶5. The case went to trial, and after the close of evidence but before deliberations, the bailiff informed the judge that a juror had fallen ill. Id., ¶14. As a result, the court took a 45-minute recess, during which time the judge met with the ill juror in chambers. Id. Neither the prosecutor nor Spencer's counsel was present for the meetings. Id. Nothing was on the record.

¶58 After the communications outside the presence of counsel occurred, the court went on the record to recreate what had transpired in the 45-minute interval. It memorialized the determination it had made before allowing the attorneys to state their positions for the record or make any motions. At the outset, the circuit court indicated that it had made its decision that the juror would not proceed to deliberations,

---

[1] Because I determine that Spencer's Sixth Amendment right was violated and the error was not harmless, I need not address the other issues presented.

2

explaining that the juror was "not feeling well enough to proceed" and that the court was "not prepared to put her health at risk by having her continue and go to deliberations when she is so unwell."

¶59 The circuit court continued making the record, advising the attorneys about the juror's condition: "She is, if you want to know the details, queasy, light headed, just unwell generally." It further explained that it had advised the attorneys of the reason for the delay, that it conferred with the attorneys, and that the court waited "a significant period of time." The circuit court also recognized that the ill juror was the only African-American juror on the panel and that the defendant was African-American.

¶60 Additionally, the circuit court stated for the record that it had asked the ill juror a question "along the lines of the concern that the defense had." The question asked was whether "her stress or her not being well enough to proceed had anything to do with her service as a juror or with the behavior of any of the other jurors." The ill juror responded, "Oh, no. This has nothing to do with the trial." Id. Ultimately, the circuit court said, "I've made my record."[2]

---

[2] The State explained to the circuit court that the juror could not be excused but instead should be dismissed for cause. It reasoned that the court could not designate the ill juror as an alternate because "alternates can only be picked at random" and therefore the court "can't designate her as an alternate per statute but [the court] can excuse her for a good reason." See Wis. Stat. § 972.10(7) ("If additional jurors have been selected . . . and the number remains more than required at final submission of the cause, the court shall determine by lot which jurors shall not participate in deliberations and discharge them.").

3

¶61 Nothing else was presented to illuminate the juror's condition or otherwise speak to the communications that took place between the court and the juror. It was not until after the circuit court made a record of its prior decision to dismiss the juror for cause that the court invited the parties to bring motions and "state [their] positions succinctly for the record."

¶62 At that time, defense counsel moved for a mistrial and renewed her Swain challenge.[3] Id. Subsequently, the jury convicted Spencer on both counts. Id., ¶16. Spencer filed a postconviction motion, arguing both that his Sixth Amendment[4]

---

[3] In Swain v. Alabama, the United States Supreme Court held that, "Although a [Black] defendant is not entitled to a jury containing members of his race, a State's purposeful or deliberate denial to [Black people] on account of race of participation as jurors in the administration of justice violates the Equal Protection Clause." 380 U.S. 202, 203-04 (1965). Earlier in this trial, Spencer's attorney argued that "Milwaukee County's procedures when impaneling jury arrays systemically excluded African-Americans and, therefore, violated Spencer's right to equal protection of the law. The trial court found that Spencer failed to prove that Milwaukee County's procedures systemically excluded African-Americans from jury service and denied Spencer's motion." State v. Spencer, No. 2018AP942-CR, unpublished slip op., ¶5 n.3 (Wis. Ct. App. Mar. 9, 2021). When Spencer's counsel renewed her Swain challenge, she argued that "the research shows . . . that even the presence of one African-American on a jury can make a difference in terms of reducing systemic bias."

[4] The Sixth Amendment provides in full:

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his

4

right to counsel was violated and that his counsel was ineffective. The circuit court denied the motion. Id., ¶18.

¶63 Spencer appealed,[5] and the court of appeals affirmed the circuit court's denial of Spencer's postconviction motion on Sixth Amendment grounds. However, it reversed the circuit court on Spencer's ineffective assistance of counsel claim and remanded the case for a Machner hearing.[6] Id., ¶¶19-20.

II

¶64 The majority's first mistake is that it concludes the communications between the circuit court and the ill juror, taking place immediately before jury deliberations and resulting in the juror's dismissal for cause, did not constitute a critical stage of the proceedings at which the right to counsel attached. See majority op., ¶4. "A critical stage is any point in the criminal proceedings when a person may need counsel's assistance to assure a meaningful defense. The assistance of counsel when a court communicates with the jury during

---

favor, and to have the Assistance of Counsel for his defence.

Article I, Section 7 of the Wisconsin Constitution also provides for the right to counsel.

[5] Spencer also argued at the court of appeals and at this court that the dismissal of the juror was an erroneous exercise of discretion and violated his due process and equal protection rights. The court of appeals determined that Spencer had forfeited those claims. I need not reach these claims or address whether they were forfeited because, as noted, I would reverse on the basis of the Sixth Amendment violation.

[6] State v. Machner, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

5

deliberations may be necessary to a meaningful defense." State v. Anderson, 2006 WI 77, ¶68, 291 Wis. 2d 673, 717 N.W.2d 74, overruled on other grounds by State v. Alexander, 2013 WI 70, 349 Wis. 2d 327, 833 N.W.2d 126.[7]

¶65 Although not precisely defined, a critical stage generally includes proceedings that determine the composition of the jury. See State v. Harris, 229 Wis. 2d 832, 839, 601 N.W.2d 682 (Ct. App. 1999); State v. Spencer, No. 2018AP942-CR, unpublished slip op., ¶50 (Wis. Ct. App. Mar. 9, 2021) (White, J., concurring in part and dissenting in part). Examples of "critical stages" are jury selection (including voir dire) and communications between the circuit court and the jury during deliberations. See, e.g., Harris, 229 Wis. 2d at 839; Gomez v. United States, 490 U.S. 858, 873 (1989); Anderson, 291 Wis. 2d 673, ¶69. As particularly relevant here, "An in-chambers conference that deals with the ability of sworn jurors to continue to serve on the jury is an exceedingly important occurrence in a criminal trial . . . " State v. Alexander, 349 Wis. 2d 327, ¶49 (Crooks, J., concurring).

¶66 The majority erroneously separates the off-the-record communications from their ultimate outcome, i.e. the dismissal of the juror. By considering only "the substance and the timing

---

[7] State v. Alexander overruled State v. Anderson to the extent that a defendant does not have a right to be present during out of court communications between the judge and the jury. State v. Alexander, 2013 WI 70, ¶¶28-29, 349 Wis. 2d 327, 833 N.W.2d 126. It remains true that "[a]ll that the Constitution requires at such a conference is the presence of defense counsel." Id., ¶29.

of the meeting," the majority concludes that "the meeting did not constitute a critical stage at which the presence of counsel was required." Majority op., ¶24. This analysis evaluates the communications in a vacuum and as a result, minimizes the right at issue. See id., ¶33.

¶67 To explain, the majority conclusively determines that because the communications were about the health of the juror, Spencer did not require aid in coping with legal problems. Id. However, this takes too narrow of a view of the "legal problem" with which Spencer required aid. Properly framed, the communications between the court and the ill juror implicated the juror's ability to serve on the jury and participate in deliberations, a consequential event during which Spencer could have benefited from the aid of counsel. See State v. Carter, 2010 WI App 37, ¶18, 324 Wis. 2d 208, 781 N.W.2d 527; see also United States v. Ash, 413 U.S. 300, 313 (1973).

¶68 Here, the ill juror sat through the entire trial except for the closing arguments. Even though deliberations had not yet begun, they were soon to commence. I agree with court of appeals Judge Maxine White's apt description of the situation: "The meeting with Juror No. 2 was not innocuous communication or a de minimis interaction; it was not a foregone conclusion that Juror No. 2 would be removed from the jury." Spencer, No. 2018AP942-CR, at ¶51 (White, J., concurring in part and dissenting in part).

¶69 Spencer could have stood to benefit from his counsel's assistance in this situation. At the very least, defense

7

counsel could have been apprised of the juror's condition firsthand and more thoroughly investigated all options. For example, this would have allowed defense counsel to be in a better position to assess the import of this particular juror and whether a longer break would result in the juror's ability to continue serving.

¶70 The majority questions the "utility" and "propriety" of an "adversarial approach to a juror's health status." Majority op., ¶35. Once again, this distracts from the substantive legal problem with which Spencer required the assistance of counsel: the dismissal of a juror for cause who observed the trial through the close of evidence.

¶71 By separating the communications between the court and juror from the juror's dismissal and treating them as distinct events, the majority paints the communications as a benign interlude with no bearing on Spencer's rights. To the contrary, the judge and juror were not merely discussing the juror's health. They were discussing the juror's health to determine if the juror should be dismissed from finishing the trial and participating in deliberations.

¶72 These communications between the circuit court and juror resulting in the juror's dismissal for cause were a critical stage of trial at which the right to counsel attached. Such communications affected the makeup of the jury, and Spencer could have benefited from the aid of counsel being in the room, at the very least to build a record. Thus, the majority is wrong to conclude these communications were not a critical stage

8

and that Spencer was not entitled to his counsel's presence at the discussions between the circuit court and the juror. It brushes off the import of the communications and how they were inseparable from the decision to dismiss the juror for cause.

III

¶73 Next, the majority stumbles again when it concludes that even if the communications were a critical stage, the error was harmless. See majority op., ¶4. The majority overlooks gaps in the record and ignores the State's burden of proof in making this determination.

¶74 Whether to apply a harmless error analysis to a deprivation of counsel claim such as this has met with inconsistent treatment. In some circumstances "[t]his court and the court of appeals have applied harmless error analysis to the denial of the Sixth Amendment right to counsel when the circuit court has had ex parte communications with the jury." Anderson, 291 Wis. 2d 673, ¶76; see State v. Koller, 2001 WI App 253, ¶62, 248 Wis. 2d 259, 635 N.W.2d 838. Thus, assuming the harmless error analysis[8] applies to these communications between the circuit court and juror, the error was certainly not harmless as the majority claims.

---

[8] Although in other circumstances courts have determined that deprivation of the right to counsel at a critical stage constitutes a structural error requiring automatic reversal, see State v. Travis, 2013 WI 38, ¶61, 347 Wis. 2d 142, 832 N.W.2d 491, I do not decide whether structural error should apply to this Sixth Amendment violation. Instead, I assume, without deciding, that harmless error applies in response to the majority's conclusion that the error was not harmless. See majority op., ¶39.

9

¶75 Where the majority finds a record sufficient to determine the error was harmless, I find a record utterly lacking. See Anderson, 291 Wis. 2d 673, ¶81 ("In light of the absence of a sufficient record, an appellate court will have great difficulty concluding that the circuit court's erroneous procedure in communicating with the jury was harmless error."). As detailed below and as referenced in Anderson, this case suffers from an insufficient record——an insufficiency which the majority overlooks and which precludes a determination that the State has met its burden of proof.

¶76 If an error is subject to harmless error analysis, the beneficiary of the error must prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. State v. Hale, 2005 WI 7, ¶60, 277 Wis. 2d 593, 691 N.W.2d 637; see also State v. Beamon, 2013 WI 47, ¶27, 347 Wis. 2d 559, 830 N.W.2d 681. In other words, the State here must prove beyond a reasonable doubt that Spencer would still have been convicted absent the Sixth Amendment violation.

¶77 Simply put, the State has failed to meet its burden of proof to show beyond a reasonable doubt that the Sixth Amendment violation did not contribute to the verdict. Neglecting to even mention the State's burden of "beyond a reasonable doubt," the majority determines that "there is no reason on this record to believe counsel's presence would have had any impact on the juror's ability to proceed." Majority op., ¶41.

¶78 Such a conclusion does not comport with our case law. In State v. Lehman, 108 Wis. 2d 291, 321 N.W.2d 212 (1982), we

were very specific about the procedure the circuit court must follow before it dismisses a juror. It includes making careful inquiry regarding the substance of the request and exerting efforts to avoid dismissing the juror:

> When a juror seeks to be excused, or a party seeks to have a juror discharged, whether before or after jury deliberations have begun, it is the circuit court's duty, prior to the exercise of its discretion to excuse the juror, to make careful inquiry into the substance of the request and to exert reasonable efforts to avoid discharging the juror. Such inquiry generally should be made out of the presence of the jurors and in the presence of all counsel and the defendant. The juror potentially subject to the discharge should not be present during counsel's arguments on the discharge. The circuit court's efforts depend on the circumstances of the case. The court must approach the issue with extreme caution to avoid a mistrial by either needlessly discharging the juror or by prejudicing in some manner the juror potentially subject to discharge or the remaining jurors.

Id. at 300.

¶79 Lehman instructs how the circuit court should conduct an inquiry before dismissing a juror even before deliberations have begun. The 45-minute gap in the record does not reflect the above inquiry, and the State has not otherwise proven the error was harmless. It argues only that because the juror was sick, she would have been dismissed no matter what.

¶80 There is no transcript of the off-the-record communications which the State can reference in endeavoring to meet its burden. And although "[t]he circuit court's efforts depend on the circumstances of the case," the State has not shown from the gaps in this record that the circumstances

11

indicate the result would have been the same absent the constitutional error.

¶81 It is clear that before the circuit court went back on the record, it had already made its determination that the juror would not continue serving on the panel. What is not clear from the transcript is whether the juror had already left the courthouse before the court went back on the record——that is, before counsel even had an opportunity to make or renew any motions. See Spencer, No. 2018AP942-CR, at ¶48 (White, J., concurring in part and dissenting in part). A review of the transcript shows the circuit court's concern for making a record of the communications and its decision to dismiss the juror but does not shed light on when the juror was actually allowed to leave. This presents a significant gap in the record. The possibility that the juror had already left the courthouse before the court went on the record certainly would further exacerbate the error.

¶82 Added to the mix, the communications between the circuit court and the juror were neither brief nor inconsequential. See Koller, 248 Wis. 2d 259, ¶¶61, 67 (assuming that the trial court erred when it responded through the bailiff without the assistance of counsel that two items the jury asked for were "not available," but finding the error harmless); State v. Bjerkaas, 163 Wis. 2d 949, 957-58, 472 N.W.2d 615 (Ct. App. 1991) (noting the parties' agreement that it was constitutional error when the trial court wrote back "no" in response to a question posed by the jury without consulting

12

counsel, but finding no prejudice to the defendant). Instead, it was an approximately 45-minute recess that determined the composition of the jury after most of the trial had concluded. A decision to dismiss a juror for cause can be consequential, implicating significant constitutional rights. See State v. Mendoza, 227 Wis. 2d 838, 849-50, 596 N.W.2d 736 (1999).

¶83 Admittedly, there may be occasions when a judge communicating with a juror outside the presence of counsel involve "the practical realities of running a courtroom," constituting harmless error. See majority op., ¶40. But this is not one of them. Rather, the law provides a clear roadmap, requiring the State to prove the error was harmless beyond a reasonable doubt, which it has not done based on this deficient record.

¶84 Judge White's separate writing at the court of appeals is instructive. She explains that the dearth of a record of the communications between the circuit court and juror precludes the conclusion that the error was harmless. See Spencer, No. 2018AP942-CR, at ¶55 (White, J., concurring in part and dissenting in part). I agree that "the scope and impact of the trial court's error is difficult to assess because of the lack of record." Id. We cannot know, and the State has not proven, whether the outcome would have been the same absent the constitutional violation. In sum, the State has failed to meet its burden of proof that the error was harmless beyond a reasonable doubt.

¶85 Accordingly, I respectfully dissent.

13

¶86 I am authorized to state that Justices REBECCA FRANK DALLET and JILL J. KAROFSKY join this dissent.

¶87 REBECCA FRANK DALLET, J. (*dissenting*). I join Justice Ann Walsh Bradley's dissent in full. As she correctly concludes, the circumstances under which the only Black juror was dismissed for cause prior to deliberations violated Spencer's Sixth Amendment rights. I write separately to emphasize the importance of racially diverse juries to enhancing both a jury's performance in criminal trials and the public's perceptions of the fairness of the legal system.

¶88 Racial diversity on juries has both constitutional and moral dimensions. For example, a categorical bar on jury service by non-white citizens violates the Fourteenth Amendment. See Strauder v. West Virginia, 100 U.S. 303, 307-08 (1879), abrogated on other grounds by Taylor v. Louisiana, 419 U.S. 522, 536 n.19 (1975). Relatedly, the way potential jurors are summoned "must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." Taylor, 419 U.S. at 538. Otherwise, that method of summoning potential jurors violates the defendant's right to a jury of his peers. See id. at 528 (explaining that "an essential component of the Sixth Amendment right to a jury trial" is that the pool of potential jurors is a "representative

1

cross section of the community").[1] The Constitution not only requires that people of all races be included in the pool of potential jurors, but it also prohibits practices designed to keep jurors of any particular race off the final panel. See, e.g., Batson v. Kentucky, 476 U.S. 79, 96 (1986) (racially motivated peremptory challenges to potential jurors violate the Fourteenth Amendment). Those principles, which are rooted in the Constitution's text, flow from the Constitution's underlying moral value of equality before the law: "The very idea of a jury is a body . . . composed of the peers or equals of the person whose rights it is selected or summoned to determine; that is, of his neighbors, fellows, associates, persons having the same legal status in society as that which he holds." Strauder, 100 U.S. at 308. In short, "[e]qual justice under law requires a criminal trial free of racial discrimination in the jury selection process." Flowers v. Mississippi, 139 S. Ct. 2228, 2242 (2019). These precedents underscore the importance of the circuit court's decision to dismiss the only Black juror on the panel after the close of evidence, and why the events leading up to that decision were a "critical stage" of the

---

[1] In Wisconsin, potential jurors are summoned from lists of individuals with valid drivers' licenses or State IDs. This is problematic because, in Milwaukee County, for instance, only 47% of Black adults and 43% of Hispanic adults have a valid drivers' license, as compared to 85% of white adults statewide. See John Pawasarat, The Driver License Status of the Voting Age Population in Wisconsin, Emp. & Training Inst., Univ. of Wis.-Milwaukee (June 2005). Thus, that system excludes more than half of the Black and Hispanic adult populations in Milwaukee County from ever being summoned for jury duty, let alone being placed on a final jury panel.

2

trial. See generally United States v. Cronic, 466 U.S. 648, 659 (1984).

¶89 Setting aside the constitutional and moral dimensions of jury diversity, research suggests that juries perform better simply if they include non-white members. See, e.g., Samuel R. Sommers, On the Obstacles to Jury Diversity, 21 Jury Expert 1, 7 (2009) ("[T]he nature and content of deliberations can actually vary by a jury's racial composition."). Although there are many ways to assess jury performance, the research focuses generally on the length and breadth of jurors' discussions, the number of factual errors made in deliberations, and the reduction of jurors' individual biases, whether implicit or explicit. See generally id.; see also Samuel R. Sommers, On Racial Diversity and Group Decision-Making, 90 J. Personality & Soc. Psych. 597, 606 (2006) On each of these metrics, diverse juries perform better than all-white ones. Specifically, juries that include even one non-white member tend to deliberate longer and discuss a wider range of evidence than all-white juries. See Sommers, Racial Diversity, supra, at 608. White jurors on diverse juries are generally more accurate in their discussion of the facts of the case than if they were on an all-white jury; and they are less likely to pre-judge the defendant's guilt, including before deliberations begin. See id. at 606 (adding that diverse juries are less likely to tolerate prejudicial statements in deliberations than are all-white juries). Similarly, jurors demonstrate "less biased reasoning when placed in a diverse decisionmaking group." See Michael Selmi, Statistical Inequality and Intentional (Not Implicit) Discrimination, 79 Law

3

& Contemp. Probs. 199, 217 & n.92 (2016). These findings mirror those in numerous other studies confirming that diversity has a positive effect on group performance in other settings. See generally Vivian Hunt, et al., Why Diversity Matters, McKinsey & Co. (Jan. 2015) (finding that corporations with gender and ethnic diversity were significantly more likely to outperform their competitors); Lu Hong & Scott E. Page, Groups of Diverse Problem Solvers Can Outperform Groups of High-Ability Problem Solvers, 101 Proceedings of the Nat'l Academy of Scis. 16385 (2004).

¶90 There are many potential explanations for these effects. One is that people bring their implicit biases with them to the jury room. See generally Justin D. Levinson & Danielle Young, Different Shades of Bias, 112 W. Va. L. Rev. 307, 326–31 (2010). For instance, Levinson and Young found that mock jurors "who saw [a] photo of [a] perpetrator with a dark skin tone judged ambiguous evidence to be significantly more indicative of guilt than participants who saw [a] photo of a perpetrator with a lighter skin tone." Id. at 337. Likewise, people are more likely to remember "aggressive facts" about a Black character in a story than a white one. See generally Justin D. Levinson, Forgotten Racial Equality, 57 Duke L.J. 345, 398–99 (2007). But an even more fundamental explanation may be that when jurors expect to have discussions with people who have different perspectives than they do, they tend to listen to the evidence more closely, prepare for deliberations more thoroughly, and guard against preconceived notions more

carefully.[2]  See Sommers, On Racial Diversity, supra, at 601.
Diverse juries might also outperform all-white juries as a
result of each juror contributing his or her own life experience
to deliberations.  As Justice Thurgood Marshall put it:

> When any large and identifiable segment of the
> community is excluded from jury service, the effect is
> to remove from the jury room qualities of human nature
> and varieties of human experience, the range of which
> is unknown and perhaps unknowable. It is not necessary
> to assume that the excluded group will consistently
> vote as a class in order to conclude, as we do, that
> its exclusion deprives the jury of a perspective on
> human events that may have unsuspected importance in
> any case that may be presented.

Peters v. Kiff, 407 U.S. 493, 503-04 (1972).

¶91 Racial diversity on juries also has a meaningful
impact on the public's perceptions of the fairness and
legitimacy of jury verdicts.  One study found that ordinary
citizens' perceptions about the fairness of a trial and the
correctness of a verdict varied depending on whether the jury
was all-white or racially diverse.  See Leslie Ellis & Shari
Seidman Diamond, Race, Diversity, and Jury Composition, 78 Chi.-
Kent L. Rev. 1033, 1043-45 (2003).  When participants were told
that a particular verdict was reached by a racially diverse

---

[2] This point and others were discussed more fully in a
recent presentation by the National Center for State Courts
(NCSC) entitled "Jury Diversity and its Role in Promoting
Confidence in the Court System," which can be viewed here:
https://cdm16501.contentdm.oclc.org/digital/collection/juries/id
/339.  The presentation was part of NCSC's ongoing "Blueprint
for Racial Justice" Project, which "is examining the systemic
changes needed to make equal justice under law an enduring
reality for all."  See https://www.ncsc.org/information-and-
resources/improving-access-to-justice/racial-justice/blueprint-
for-racial-justice.

jury, they perceived the trial to be equally fair <u>regardless of whether it ended in a conviction or an acquittal</u>. <u>Id.</u> at 1049. The same was not true, however, when the jury had no racially diverse members: "[W]hen the jury did not include minority members, observers viewed the trial as less fair when it produces a guilty verdict than when it produced a not guilty verdict." <u>Id.</u> The key takeaway from this study is that participants thought a verdict was unfair "only when [they] questioned the procedure that procured it, i.e., the racial composition of the jury." <u>Id.</u>

¶92 I do not mean to suggest that discharging the only juror of color is always erroneous, or that doing so here prejudiced Spencer. After all, "[d]efendants are not entitled to a jury of any particular composition." <u>Taylor</u>, 419 U.S. at 538. Instead, I write to emphasize the importance of racially diverse juries to both the quality of verdicts and the perception of fairness in the judicial system. Given that "[t]he purpose of the jury system is to impress upon the criminal defendant and the community as a whole that a verdict of conviction or acquittal is given in accordance with the law by persons who are fair," <u>Powers v. Ohio</u>, 499 U.S. 400, 413 (1991), juries themselves must be perceived as fair, and therefore must reflect the communities from which they are drawn.

¶93 I am authorized to state that Justice JILL J. KAROFSKY joins this dissent.

6