COURT OF APPEALS
DECISION
DATED AND FILED

May 16, 2023

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal Nos.** **2019AP1242-CR**
**2019AP1243-CR**
STATE OF WISCONSIN

Cir. Ct. Nos. 2016CF1896
2016CF2454

IN COURT OF APPEALS
DISTRICT I

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

JOHN EARL MANNERY,

DEFENDANT-APPELLANT.

APPEALS from judgments and orders of the circuit court for Milwaukee County: JEFFREY A. CONEN, Judge. *Affirmed*.

Before Donald, P.J., Dugan and White, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. John Earl Mannery, *pro se*, appeals from his convictions for seven counts, entered upon a jury's verdicts in two cases joined for trial and consolidated on appeal. He also appeals from the orders denying his postconviction motions for relief. Mannery argues that the State's evidence was insufficient to support the jury's verdicts, that his trial counsel was ineffective for failing to impeach several of the State's witnesses, that he was denied his constitutional right to be present or have counsel present during jury deliberations and when the court answered jury questions, and that cumulative errors prejudiced his defense. We reject all of his arguments and affirm.

## BACKGROUND

¶2 Mannery's first case arises from human trafficking charges in May 2016. According to the criminal complaint in Milwaukee County Circuit Court case No. 2016CF1896 (hereinafter the Trafficking Case), Mannery was alleged to have engaged in trafficking a child, soliciting a child for prostitution, child enticement–intent to cause a child to engage in prostitution, human trafficking, and physical abuse of a child. All counts related to Alice, and all counts were alleged to have occurred between summer 2015 and February 2016.[1]

¶3 The complaint in the Trafficking Case alleged that from summer 2015 through February 2016, Alice stayed with Mannery at multiple hotels in Milwaukee County, including hotels on South 27th Street and Layton Avenue, on South 27th Street and Cold Spring Road, and on Appleton Avenue and Silver

---

[1] To protect the privacy and dignity of the Mannery's victim, we refer to her by a pseudonym. *See* WIS. STAT. RULE 809.86 (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

Spring Drive. Alice regularly engaged in prostitution acts arising out of the ads Mannery placed online and she gave him the monetary proceeds from those acts. Alice reported that Mannery told her he would kill her if she did not give him all of the money she made from prostitution. Mannery was physically abusive toward Alice on multiple occasions and he refused her access to food and money.

¶4 Mannery's second case arises from two counts of witness intimidation, in furtherance of a conspiracy, while he was in custody for the Trafficking Case in May 2016. According to the criminal complaint in Milwaukee County Circuit Court case No. 2016CF2454 (hereinafter the Intimidation Case), Mannery knowingly and maliciously attempted to dissuade Alice from appearing in court or cooperating in the prosecution of the Trafficking Case. In four jail phone calls made and recorded between May 8 and May 12, 2016, Mannery conspired with multiple other individuals to prevent Alice from appearing. The complaint and information of the two counts of felony intimidation of a witness in furtherance of a conspiracy were filed in June 2016.

¶5 The court joined the two cases in June 2016 upon the State's motion, which was heard without objection from Mannery's counsel. The joined cases proceeded to a jury trial on August 29, 30, and 31, 2016, and September 1 and 2, 2016. The State's first witness was Milwaukee Police Department (MPD) Detective Lynda Stott, who works on the human trafficking task force and who provided information about common practices in human and child trafficking, prostitution, and abuse in these systems. The State next called a manager from a hotel on North 60th Street and Fond du Lac Avenue in Milwaukee. He identified a registration card from his hotel that showed a copy of Mannery's driver's license; it was their practice to photocopy the driver's license of everyone who rented a room.

¶6 The State called Alice, who testified that when she was sixteen, she met Mannery at a gas station on North 35th Street and they exchanged phone numbers. She explained that the day after meeting Mannery, she texted him asking for a ride, which he provided. She and Mannery went to a hotel that another friend of Alice's had rented for her because she was homeless. Alice felt that Mannery had a "different demeanor and had a different attitude, like he wasn't from here. Kind of like he was … bigger than the city. Kind of like I want to be. I don't want to be stuck in the city my whole life."

¶7 Alice testified that that first week, they spent several nights in a hotel, a night in the car, they had "a lot of great times," but they also argued. She thought Mannery was sweet and she was falling in love with him; however, they also argued over money and he became very upset when Alice called him a "bitch ass" in a joking manner. Mannery put his hands around her neck, told her not to call him that, and said it was disrespectful. She felt intimidated.

¶8 Alice testified that she did not want to get into the prostitution "lifestyle", which she defined as the "whole pimp and ho thing and the selling yourself for money[.]" Alice testified that Mannery taught her about prostitution and Backpage.com online ads;[2] he brought her closer and closer to prostitution, and controlled her with abuse. She did not want to use photographs of herself for Backpage ads, but instead, copied and pasted images from other ads. Mannery would check over the ads and offer his opinion about whether the images she

---

[2] Detective Stott testified that Backpage.com is an "online classified" website that has "many legitimate purposes," but it also "has an escort tab; and that is a place in which … people involved in prostitution that are working independently in attempts to obtain [meetings] will post, along with where traffickers will post individuals in attempts to get [meetings]."

picked looked like her. Alice stated that she used Mannery's phone to place ads on Backpage, or he would do it directly. She reviewed three print outs from Backpage ads that she had placed, all directing callers to Mannery's phone number. The ads were dated July 28, 2015, August 3, 2015, and September 17, 2015. The ads were admitted as exhibits and published to the jury.

¶9      Alice testified about a time when they were at a hotel on Appleton Avenue and Silver Spring Drive. Mannery beat her up, "busted her lip, and whacked her face[.]" She yelled for help, but no one helped her. She asked Mannery to take her to the hospital, but he refused. She subsequently sent photographs of her injuries [that Mannery caused] to her aunt and her mother.

¶10      Alice testified that during her acts of prostitution, she engaged in penis-to-vagina intercourse and oral sex. She recounted a time when she had exchanged messages with a potential customer (a "trick") and Mannery became upset and violent about the content and pricing discussed, and for the first time he said to her, "Now, if you don't give me your money, I'm going to beat your ass and I'm a pimp and you the ho[.]" She then stated that he "threw a whole thing of water on me, was throwing food from breakfast on me, kicking me to the ground, wouldn't let me out the bathroom. We were fighting for like almost a whole hour." Mannery told her that she better give him all of the money and kept hitting her. When the trick arrived, Alice asked to leave with him and said she felt unsafe; the trick dropped her at another hotel and paid for a room at that hotel, and she spent the night alone. However, later, she called Mannery from the hotel because she was worried he was out on the streets by himself.

¶11      Alice testified that when she first engaged in prostitution acts, she would hide the money, stating, "I never gave it to him unless—until he started

5

threatening me and telling me I had to, that's when I end up leaving." When she did keep the money, she would spend it on food for them or gas for the car. She explained:

> In the beginning it was different, I handed it to him the first time. Because I really didn't know—I never seen a pimp and a ho, never did any of that stuff. I never thought of myself as that, and I never looked at him as a pimp because he's not. No matter what, he's not. So what happened was just out of pure madness.

¶12 Alice testified that they did not have a stable place to live. She stated that they spent time at his father's house, which was "raggedy" and "nasty," on North 19th Street and Keefe Avenue in Milwaukee. She recalled an incident at that address in which Mannery was abusive to Alice, ripping her mouth open on the inside when she kept asking about another woman he was talking with and "messing around with." She needed stitches from that incident.

¶13 Alice stated that she loved Mannery and stayed faithful to him, but he did not think she was faithful because she engaged in prostitution acts. Some days she would not engage in prostitution, but then Mannery would be mad if she left or he would beat her and then withhold food from her. Alice reported that she left Mannery on several occasions and went to the houses of friends whom she believed would not turn her in to police because there was a runaway warrant out for her. Alice testified about Mannery meeting her family and them not approving. The DA questioned her about an incident:

> Q: So let me get this straight, [Alice]. This night we're talking about, you could have slept in your grandma's house but you chose to sleep outside in a dog kennel in a sleeping bag with him?
>
> A: Yeah, but at the end of the day, it doesn't matter because I would have done anything for him. So I didn't

6

care if we were out on the streets as long as we were together.

¶14 Alice testified about an incident in which she and Mannery fought in a bathroom and her mouth was bashed in, chipping a tooth. A photo was admitted and shown to the jury. The State also showed Alice photographs taken by police in 2016, which she testified shows scars on her body caused by prior incidents and beatings by Mannery. The photographs were admitted as exhibits eight through fourteen.

¶15 The State played a portion of audio from four recorded calls at issue in the Intimidation Case. In the first call, Alice recognized a male voice as Mannery's and the female voice as a family member. In the second call, Alice recognized a male voice as Mannery's and a second male voice as Mannery's father. In the third call, Alice recognized a male voice as Mannery's, but could not identify the female voice. In the fourth call, Alice recognized a male voice as Mannery's and a second male voice as Mannery's brother.

¶16 Alice testified that Mannery's sister and she had a conversation about Mannery and Alice's relationship problems. The prosecutor questioned Alice:

> Q: [Alice], do you remember telling Detective Stott that when you spoke with [Mannery's sister] she made you feel guilty about her brother being in trouble? Do you remember telling her that?
>
> A: I felt bad, yes. I did feel very bad.
>
> Q: After the [conversation] you had with [Mannery's sister]?
>
> A: In general, I've always felt bad about it.
>
> Q: But that [conversation] was part of it, right?
>
> A: Yes.

7

¶17    During cross-examination, Alice confirmed that she and Mannery smoked marijuana when they could.  She also said her understanding of the time while they were together was off, "[a] lot of different things happened during that period of time."  She agreed that her ability to recall was impaired.  Alice explained that she was underage and did not have official identification; therefore, any hotel registrations were done by Mannery.  She testified that she often did not perform sexual acts, but instead, would set up the meeting, take the money upfront, and then lock the man out of the hotel room.  She testified that Mannery was nearly always around when she engaged in acts of prostitution.

¶18    During the State's redirect examination, Alice testified that Mannery both told her he was "the pimp" and she was "the ho," but also that he was "not a pimp."  She testified that he was not a "pimp," but he was "abusive" and "controlling."  "But I didn't consider him as a pimp.  He was a—someone who was trying to get money out of me by making it seem like he was in love with me[.]"

¶19    The State called Alice's father.  He testified that Alice had a history of running away, starting around age fifteen.  During cross-examination, trial counsel asked him if Alice had a "problem with drugs?"  Alice's father said she did, "here and there" and knew that she was "smoking marijuana."  Trial counsel asked, "Any other drugs?"  Alice's father responded, "I don't think so.  [Not] That I know of."

¶20    The State called Alice's mother.  She testified that Alice introduced her to Mannery at Summerfest during 2015.  She testified about a call from Alice when it was cold outside, saying she and Mannery needed a place to stay.  Her mother said she could stay if it was just her, but she did not want Mannery in her

8

house or to know where she lived. Her mother picked them up and drove them to Mannery's father's house near 19th Street and Keefe Avenue; she tried to get Alice to come with her and she refused. On Alice's seventeenth birthday in early July 2015, Alice invited her mother to visit her at a hotel near Oak Creek. Alice did not answer her mother's repeated phone calls and texts, so her mother asked the front desk for help and eventually called the Oak Creek police. The police found Alice in a room; her mother reported that she had bruises all over her arms and legs. The police "had someone from the children's bureau" pick up Alice, who had a warrant out for running away, and that office transported Alice to a group home.

¶21    Alice's mother testified that she had sporadic contact with Alice after that, but in January or February 2016, she received a call in the middle of the night from Alice, asking to be picked up from Mannery's father's house. Despite waiting forty-five minutes for Alice to exit the house, she did not leave the house with her mother. About a week later, Alice's mother saw Alice and noticed that Alice had new bruises up and down her legs, a knot on her head, and a cracked tooth. Alice's mother testified that she had responded to Alice's calls and picked her up on approximately five occasions after her seventeenth birthday in early July 2015.

¶22    During cross-examination, Alice's mother testified that she knew her daughter smoked marijuana, but did not know about any cocaine or crack cocaine use.

¶23    The State next called Alice's maternal aunt. Alice's aunt testified that she had some contact with Alice after her birthday in early July 2015; Alice asked her aunt for money, and Alice had both new and fading bruises on her body.

Alice's aunt responded to Alice's requests to be picked up during this time, and offered to help her escape the abusive relationship with Mannery, but she could not keep helping if Alice went back to Mannery. Prior to September 2015, Alice's aunt received a text from Alice with a photograph of Alice attached; Alice had a black and blue eye, and her lip was bleeding.

¶24    During cross-examination, Alice's aunt testified that she knew Alice smoked marijuana with Mannery, but did not know about any cocaine or crack cocaine use.

¶25    The State called MPD Detective Carolyn Tillman, who testified that she had worked on the human trafficking task force and that she interviewed Mannery when he was taken into custody for an unrelated incident in April 2016. The detective showed Mannery a photograph of Alice and he stated he did not know the person in the photograph. The State played a portion of audio from four recorded calls at issue in the Intimidation Case. In each call, Detective Tillman recognized a male voice as Mannery's based on her in-person interview with him.

¶26    The State called Oak Creek Police Officer Gary Schneider. The officer responded to the call from the hotel on Alice's seventeenth birthday in early July 2015. After discussion with the hotel clerk, the officer knocked on the door to the room where Alice was and made contact with her when she answered the door. The officer noted that her arms were black and blue. After confirming who she was and that she was a missing runaway, the officer asked if she was being prostituted. When Alice said yes, the officer made contact with Milwaukee high intensity drug trafficking force. Shortly into his investigation, the officer was contacted by an analyst for the Federal Bureau of Investigations (FBI) human trafficking task force in Milwaukee.

¶27    The State called FBI Special Agent Heather Wright.  Agent Wright investigates human trafficking and is a member of the Milwaukee human trafficking task force.  She became aware of Alice because of reports to the task force by child protective services and Alice's parents, who contacted the task force because Alice was a runaway and considered to be in danger.  Agent Wright met with Alice three or four times during the case, mostly for interviews, but also during transportation to different group homes.

¶28    During cross-examination, Agent Wright testified that the FBI had not gotten responsive records from Milwaukee area hospitals relating to Alice's name or her aliases.  The agent had also not found any hotel registration records for Mannery in the timeframe of the abuse charge at the hotel on Silver Spring Drive and Appleton Avenue.  Agent Wright also testified that there had been no responses yet to the subpoenas issued for hotel records at approximately sixteen hotels that Alice identified in interviews as possible places she had stayed.

¶29    Trial counsel asked Agent Wright if Alice told her that she used crack cocaine.  The State objected that the information was irrelevant and hearsay; after an off-the-record sidebar, the court sustained the objection.  The court explained its reasoning on the record.  First, Alice was not asked whether she gave a statement about crack cocaine to Agent Wright, so there would not be a "prior inconsistent statement."  Second, the timing of the question "did not give the State the ability to ask additional questions to … allow [Alice] to give an explanation if there was some reason why she gave this inconsistent statement."  Third, the question about crack cocaine was irrelevant because there had been "admissions that [Alice and Mannery] used marijuana and they used alcohol.  There's been admissions that there's been some … impairment over the course of the time, so if

11

this is going to be an argument that somehow she was impaired and couldn't perceive certain things, it's already out there."

¶30 As foundation for the jail calls, the State called two witnesses with the Milwaukee County District Attorney's (DA) office, an investigator and witness protection analyst. The witness protection analyst reviewed Mannery's jail phone calls, identified four concerning calls between May 8 and 12, 2016, and provided recordings and partial transcripts of the calls to the DA's office. Transcripts of the four calls were distributed to the jury while the recordings of the calls were played. We recite from the transcripts of the calls admitted at trial.[3]

¶31 From the first call, onMay 8, 2016, Mannery, designated as "D" and an unidentified female caller, designated as "F":

> F: Well I had talked to ol' girl, she said she ain't gonna do nothing, though.
>
> D: She–she said she ain't coming?
>
> F: Yeah.
>
> D: Okay, good looking. Keep–make sure she don't, on my son. I really can't talk about it on the phone, but make sure she don't.
>
> F: Right, mhm.

¶32 From the second call, on May 9, 2016, Mannery, designated as "D" and an unidentified female caller, designated as "F":

---

[3] We recite from the exhibits published to the jury of the transcripts of the recorded jail calls prepared by the DA's office's witness protection analyst. The telephone calls are informal and involve familiar language and profanities. For this reason we have not used "[sic]" to indicate each error or mistake in the text. *See **United States v. Mitchell***, 353 F.3d 552, 555 n.4 (7th Cir. 2003).

D: What'd ol' girl say, man?

F: I haven't talked to her, I been trying to get her number. The only people that talked to her was [Mannery's brother and sister] so far that I know of, but [Mannery's brother] said she said she wasn't trying to come to this little thing or whatever, she was gonna say no and shit like that, so I'm not sure.

D: Yeah [unintel]-1 don't want the bitch to be lying talking about she ain't gonna show up and show up and shit.

¶33 From the third call, on May 9, 2016, Mannery, designated as "D" and an unidentified male caller, designated as "M":

M: So is ol' girl–is she showing up? They can always drop the shit after that, right?

….

D: Yeah, if she don't show up period they gon' drop it.

….

M: Well she said she wasn't gonna show up, but then all of a sudden she said you deserve something for beating her up or something. That's what [Mannery's brother] said, I don't know. I haven't talked to her, apparently [Mannery's sister] talked to her too, though.

….

D: So why—why don't y'all just tell her call the DA and tell her that she said she was lying or some shit.

M: I don't know, you didn't admit to nothing did you?

D: No, what I'm gonna admit to? I ain't do nothing.

M: I don't know, that's what I'm saying. But anyway, she say she not gonna show up, so like I said if she don't show up they gotta–they gotta drop the shit.

….

D: But y'all gotta make sure she don't show up because if she do they trying to give me a hundred years for the hoe-ass shit…. We just gotta make sure ol' girl don't come to court and shit. I'll be out.

13

¶34 From the fourth call, on May 12, 2016, Mannery, designated as "D" and an unidentified male caller, designated as "M":

D: So ain't nobody coming to court?

M: That's what I heard.

.....

D: Tell her to call the DA office and tell her that she was lying or some shit, man.... And tell her write a letter or something telling 'em that she lying, that shit ain't true, man, that shit bullshit.... Tell her ass to call the DA office or some shit, don't be sitting up there crying, get me the fuck up out this motherfucker.... Just make sure motherfucker don't come to court, man, that's all I can say. I can't even speak about it [unintel]-

....

M: A'ight, I'm gonna do what I can, bro. I'm gonna try my best, bro.

¶35 The State recalled Detective Stott. In her role in the investigation, she conducted interviews, approximately nine of them, consisting of Alice, Alice's mother, Alice's aunt, and five hotel staff members. She also sought receipts from the hotels Alice identified, which resulted in some receipts in evidence and some failures to find receipts or get information from the hotels. She interviewed Alice in March 2016. In May 2016, Alice ran away from a group home in northern Illinois where she had been living. Alice was very difficult to find and was still missing until the week prior to trial.

¶36 The jury returned guilty verdicts on the seven counts in the joined cases. The court entered the judgments of conviction. The court granted Mannery's counsel's motion to withdraw. In December 2016, the trial court imposed a global sentence of thirty-five years, divided as twenty-five years of initial confinement and ten years of extended supervision.

14

¶37    Mannery moved for postconviction relief, arguing that his counsel was ineffective for failing to impeach Alice's testimony with evidence of regular use of crack cocaine.  In June 2019, the trial court denied Mannery's motion without a hearing.  Mannery appeals.

## DISCUSSION

¶38    On appeal, Mannery, *pro se*, makes four arguments.  First, he argues that the evidence was insufficient to support his conviction for multiple counts.  Second, he renews his argument that his trial counsel was ineffective for failing to impeach Alice with evidence of prior crack cocaine use.  Third, he asserts that his constitutional right to be present and to have trial counsel be present at critical stages was violated during the jury's questions during deliberations.  Fourth, he argues that cumulative errors infected the trial and violated his right to due process.  We reject his arguments and address each below.

### I.    Sufficiency of the evidence

¶39    Mannery contends that the State's evidence was insufficient on multiple counts.  "The question of whether the evidence was sufficient to sustain a verdict of guilt in a criminal prosecution is a question of law," which we review independently.  *State v. Smith*, 2012 WI 91, ¶24, 342 Wis. 2d 710, 817 N.W.2d 410.  We "will uphold the conviction if there is any reasonable hypothesis that supports it." *Id.*

¶40    "The burden of proof is upon the state to prove every essential element of the crime charged beyond reasonable doubt." *Bautista v. State*, 53 Wis. 2d 218, 223, 191 N.W.2d 725 (1971).  "Although the trier of fact must be convinced that the evidence presented at trial is sufficiently strong to exclude

15

every reasonable hypothesis of the defendant's innocence in order to find guilt beyond a reasonable doubt," on appeal, the reviewing court may not substitute its "judgment for that of the trier of fact unless the evidence, viewed most favorably to the [S]tate and the conviction, is so lacking in probative value and force that no trier of fact, acting reasonably," could have found the requisite guilt. ***State v. Poellinger***, 153 Wis. 2d 493, 503, 507, 451 N.W.2d 752 (1990). "If more than one inference can be drawn from the evidence, we must adopt the inference that supports the conviction." ***State v. Long***, 2009 WI 36, ¶19, 317 Wis. 2d 92, 765 N.W.2d 557.

### A.  Intimidation of a witness in furtherance of a conspiracy

¶41    First, in the Intimidation Case, Mannery argues that the State failed to prove a required element of both counts:  that one or more parties to the conspiracy made an overt act to effectuate this crime.  To prove felony intimidation of a witness, the jury was instructed that the State had to prove that (1)  Alice was a witness; (2)  Mannery "attempted to prevent or to dissuade [Alice] from attending or giving testimony at a proceeding authorized by law"; and (3) Mannery "acted knowingly and maliciously."  Further, the jury needed to decide whether Mannery acted in furtherance of a conspiracy, which was defined for the jury that, under WIS. STAT. § 939.31, "is committed by one who, with intent that a crime be committed, agrees or combines with another for the purpose of committing that crime, if one or more of the parties to the conspiracy does an act to effect its object."

¶42    Mannery argues that the State failed to prove an "overt act" in furtherance of the conspiracy.  Returning to the jury instructions, the State must prove that:

16

> [O]ne or more of the conspirators performed an act toward the commission of the intended crime that went beyond mere planning and agreement.… However, the act need not, by itself, be an unlawful act or an attempt to commit the crime. If there was an act which was a step towards accomplishing the criminal objective, that is sufficient.

Mannery argues that the timeline of the intimidation allegations make the State's case impossible. He asserts that the jail phone calls occurred while Alice was in a group home and could not be reached to be intimidated. However, Mannery's argument is not supported by any material facts and he fails to cite to the record to support his factual positions, contrary to WIS. STAT. RULE 809.19(1).[4] Therefore, we will not consider this argument. *See* **State v. Pettit**, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) ("We may decline to review issues inadequately briefed.").

¶43 The State argues that the record reflects that police witnesses and Alice identified Mannery's voice on four recorded jail calls. Alice further identified Mannery's father, brother, and a female family member on the calls. Mannery repeatedly asked whether "ol' girl"—meaning Alice—was coming to court and asking his family to talk to her and "make sure she don't" come to court. In the third call, Mannery told his father, "why don't y'all just tell her call the DA and tell her that she said she was lying[.]" In the fourth call, Mannery tells his brother to tell Alice to "write a letter or something telling 'em that she lying, that shit ain't true[.]"

---

[4] An appellant's brief to this court must contain "a statement of facts relevant to the issues presented for review, with appropriate references to the record," WIS. STAT. RULE 809.19(1)(d), as well as an "argument on each issue," citing "the authorities, statutes and parts of the record relied on," RULE 809.19(1)(e).

17

¶44 During Alice's testimony, she stated that she had a conversation with Mannery's sister, and she felt very bad about Mannery's court case. Further, Alice testified that Mannery's brother called her after Mannery's sister called and he did not threaten her, but he did tell her that she did not need to testify. Thus, we concluded it is reasonable to infer that Mannery's brother and sister were acting upon the conspiracy arranged during Mannery's calls urging his family to attempt to reach Alice.

¶45 The calls provide sufficient evidence for the jury to have found that the State proved that Mannery "acted knowingly and maliciously" and "attempted to prevent or to dissuade [Alice] from attending or giving testimony at a proceeding authorized by law." Mannery's siblings' contact with Alice was sufficient to show an overt act in furtherance of the conspiracy. Mannery has failed to show that the evidence was "so lacking in probative value and force that no trier of fact, acting reasonably," could have found the requisite guilt. *Poellinger*, 153 Wis. 2d at 507. Although Mannery may suggest alternate reasons for Alice to feel bad or to not want to come to court, the reviewing court adopts the inference to be drawn from the evidence "that supports the conviction." *Long*, 317 Wis. 2d 92, ¶19. Accordingly, Mannery's first claim of insufficient evidence fails.

### B. Trafficking of a child and human trafficking

¶46 Second, in the Trafficking Case, Mannery argues that the State failed to prove an element of count one, trafficking of a child, and count four, human trafficking, specifically to prove that he received compensation or benefit from

18

commercial sex acts related to Alice.[5]  In both counts, the jury had to find that the State proved that Mannery "recruited, enticed, provided, obtained, or harbored [Alice] for the purpose of commercial sex acts."  A commercial sex act was further defined as "sexual contact or sexual intercourse for which anything of value is given to, promised, or received, directly or indirectly, by any person."

¶47    The record refutes Mannery's argument.  Alice testified that Mannery told her he would kill her if she did not give him all of the money she made from prostitution.  The record also reflects that Alice testified that she did not consider Mannery to be a "pimp," but she said he was "abusive" and "controlling."

¶48    Mannery asks us to consider several phrases from Alice's testimony out of context:  "I never gave it to him" and Mannery "was not a pimp" to show that he was not deriving value from Alice's commercial sex acts and that she was instead, an "independent" sex worker.  However, the question before us is not whether Mannery was a "pimp" or whether Alice thought of him as a "pimp," but what was Mannery's conduct as it related to Alice's acts of prostitution.  The record in total reflects that Alice withheld money received from commercial sex acts from Mannery until he threatened her, and he was abusive and controlling in

---

[5] There are overlapping elements in the two trafficking counts against Mannery.  To prove trafficking of a child, the jury was instructed that the State had to prove that (1) Mannery "knowingly recruited, enticed, provided, obtained, or harbored" Alice, (2) Alice had not attained the age of eighteen years, and (3) Mannery "recruited, enticed, provided, obtained, or harbored [Alice] for the purpose of commercial sex acts."  To prove human trafficking, the jury was instructed that the State had to prove that (1) Mannery "knowingly engaged in trafficking" meaning that Mannery "recruited, enticed, harbored, transported, provided, obtained" Alice; (2) Mannery "recruited, enticed, harbored, transported, provided, or obtained [Alice] for the purpose of a commercial sex act"; and (3) Mannery "engaged in trafficking by causing or threatening to cause bodily harm to any individual."

trying to take money from her. The record is replete with evidence of his physical and verbal assaults to ensure she continued to engage in commercial sex acts. To the extent that Mannery argues that the State failed to prove he was compensated by Alice's commercial sex acts, this argument fails based on the factual record.

¶49    Further, to prove these counts, the State did not need to show that Mannery was compensated, but that he "enticed, provided, obtained, or harbored" Alice for the purpose of her engaging in "commercial sex acts" in which "a thing of value is given to, promised, or received." The record reflects that based on Alice's testimony, Mannery helped create Backpage ads for the purpose of Alice to engage in acts of prostitution, he provided hotel rooms for Alice to meet with tricks and hotel rooms for them to sleep, he drove her to arranged "commercial sex acts" with tricks, and he took money that Alice received from commercial sex acts. There was ample evidence for the jury to find that the State proved all elements of the trafficking charges. Accordingly, Mannery's second claim of insufficient evidence fails. *See **Poellinger***, 153 Wis. 2d at 507.

### C. Child enticement–prostitution

¶50    Third, in the Trafficking Case, Mannery argues that the State failed to prove two elements of count three, child enticement, specifically that Mannery caused Alice to go into a room with intent to engage in prostitution. To prove count three, the jury was instructed that the State had to prove that (1) "[Mannery] caused [Alice] to go into a room"; (2) "[Mannery] caused [Alice] to go into a room with intent to engage in prostitution"; and (3) Alice was under the age of eighteen years. Mannery argued that there was no evidence that he caused Alice to go into a room, much less to go into a room with an intent to engage in

prostitution. Mannery contends that the State's failure to present hotel receipts in his name showed that he did not provide "rooms" for prostitution.

¶51    Mannery's argument fails because the State's case was not dependent only on hotel receipts. Alice testified that Mannery "would wait in the [hotel] bathroom while" she engaged in an act of prostitution in the hotel room. She testified that Mannery was always nearby while she met up with tricks. She testified that the acts would occur in hotel rooms rented by the trick or at the trick's house and that Mannery drove or accompanied her to those locations. Alice's testimony, therefore, provided sufficient evidence to support the jury's finding on the child enticement count. *See* **Poellinger**, 153 Wis. 2d at 507. Accordingly, Mannery's third insufficient evidence claim fails.

### D. Physical abuse of a child

¶52    Fourth, in the Trafficking Case, Mannery argues that the State failed to prove an element of count five, physical abuse of a child, specifically to prove that any physical abuse occurred at the address and timeframe named in the information. To prove physical abuse of a child, the jury was instructed that the State had to prove that (1) Mannery "caused bodily harm" to Alice; (2) Mannery "intentionally caused bodily harm"; and (3) Alice "had not attained the age of [eighteen] years at the time of the alleged offense." The complaint and Information alleged that the abuse occurred in summer 2015 near Silver Spring Drive and Appleton Avenue.

¶53    Mannery asserts that there was no physical evidence that he abused Alice. He points out that the photographs presented to the jury showing injuries to Alice were not connected to this location or time. Further, he argues that the State failed to show when and where this alleged conduct occurred. The record does not

include hotel receipts that show Mannery registered a room at any hotel near the thatcorner of Silver Spring Drive and Appleton Avenue during that time period.

¶54 The State asserts that Alice's testimony provides direct evidence that Mannery assaulted her and caused bodily harm during the summer of 2015. Her testimony established the place and time of the assault, stating that they were at a hotel on Appleton Avenue and Silver Spring Drive, when Mannery beat her up, busted her lip, and whacked her face. Alice's mother and Officer Schneider testified to seeing Alice in early July 2015 with bruises that were consistent with Alice's testimony about the assault.

¶55 Mannery contends that the State failed to provide any evidence that he was at this location during this time period. He asserts without basis that Alice's testimony is incredible because she could not have been with Mannery at that hotel when she was in a different place with different people. However, he makes these allegations without citation to the record. While Mannery suggests that Alice's testimony should be considered incredible, his position is purely speculative and made without citation to the record or the facts. *See* WIS. STAT. RULE 809.19(1)(d).[6] Alice's testimony provides direct evidence of the assault. Alice's mother and Officer Schroeder provide circumstantial evidence that Alice had bruising consistent with the assault. "It is well established that a finding of guilt may rest upon evidence that is entirely circumstantial[.]" ***Poellinger***, 153 Wis. 2d at 501. Here, there is direct and circumstantial evidence to support the

---

[6] An appellate court is improperly burdened where briefs fail to consistently and accurately cite to the record. ***Meyer v. Fronimades***, 2 Wis. 2d 89, 93-94, 86 N.W.2d 25 (1957). This court is not required to sift through the record for facts. ***Keplin v. Hardware Mut. Cas. Co.***, 24 Wis. 2d 319, 324, 129 N.W.2d 321 (1964).

jury's findings. Mannery has not shown that evidence and inferences from that evidence was "incredible as a matter of law." **Id.** at 507. The record supports that a "possibility exists that the trier of fact could have drawn the appropriate inferences from the evidence adduced at trial to find the requisite guilt[.]" **Id.** Accordingly, we reject Mannery's argument on the fourth claim.

¶56    Ultimately, we conclude that Mannery's four challenges to the sufficiency of the evidence fail.

## II.    *Ineffective assistance of counsel*

¶57    Mannery asserts that trial counsel was ineffective for failing to impeach Alice's testimony with evidence of her regular crack cocaine use. He contends that evidence of Alice's history with crack cocaine would have impeached her credibility as well as the credibility of two of the State's other witnesses. The trial court denied Mannery's motion for postconviction relief without an evidentiary hearing.

¶58    When a postconviction motion is denied without an evidentiary hearing, we independently review "whether the motion on its face alleges sufficient material and non-conclusory facts that, if true, would entitle the defendant to relief" and "whether the record conclusively demonstrates that the defendant is not entitled to relief." **State v. Jackson**, 2023 WI 3, ¶8, 405 Wis. 2d 458, 983 N.W.2d 608. "[I]f the motion does not raise facts sufficient to entitle the movant to relief, or presents only conclusory allegations, or if the record conclusively demonstrates that the defendant is not entitled to relief, the circuit court has the discretion to grant or deny a hearing." **State v. Allen**, 2004 WI 106, ¶9, 274 Wis. 2d 568, 682 N.W.2d 433.

¶59    Therefore, we consider whether Mannery has sufficiently alleged that trial counsel was ineffective, for which we rely on the two-prong test stated in *Strickland v. Washington*, 466 U.S. 668 (1984).  Under that test, a defendant must show both that counsel's performance was deficient and that the defendant was prejudiced by counsel's performance.    *Id.* at 687.    "Counsel's conduct is constitutionally deficient if it falls below an objective standard of reasonableness." *State v. Thiel*, 2003 WI 111, ¶19, 264 Wis. 2d 571, 665 N.W.2d 305.  To prove that counsel's deficient performance prejudiced his defense, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.  In our analysis, we "may reverse the order of the two tests or avoid the deficient performance analysis altogether if the defendant has failed to show prejudice" from counsel's performance. *See State v. Johnson*, 153 Wis. 2d 121, 128, 449 N.W.2d 845 (1990).

¶60    Mannery argues that trial counsel should have done more to bring Alice's alleged crack cocaine use into the trial.  Mannery's postconviction motion relied upon reports from FBI Agent Wright that were contained in the case record, but this evidence was not raised at trial.  In these reports, there are references to Alice discussing cocaine use with Agent Wright, as well as Alice's aunt and mother being aware of Alice's cocaine use.  Nevertheless, the record reflects that counsel did attempt to bring cocaine use into the trial.  Trial counsel questioned Alice about drug use, which she denied other than marijuana.  Trial counsel questioned Alice's mother and aunt specifically about whether Alice used cocaine or crack cocaine, which both women denied knowing if she did.  However, trial

counsel did not attempt to impeach any of these witnesses with statements to Agent Wright.

¶61 Trial counsel did make a secondary attempt to bring the cocaine issue in Agent Wright's report into the trial, specifically during the cross-examination of Agent Wright. Mannery fails to acknowledge that the trial court sustained the State's objection to these questions. Among other reasons, the trial court ruled the line of questioning was not relevant because there had been "admissions that [Alice and Mannery] used marijuana and they used alcohol" and that Alice may have some "impairment over the course of the time." Therefore, the court concluded that any argument that Alice was impaired and unable to perceive things had already been made.

¶62 On appeal, Mannery continues to argue that showing Alice's cocaine use would have proven an impairment of her memory or faulted her credibility. However, this line of reasoning was refuted by the trial court. Any additional questioning would not have yielded a different result. "An attorney does not perform deficiently by failing to make a losing argument." *State v. Jacobsen*, 2014 WI App 13, ¶49, 352 Wis. 2d 409, 842 N.W.2d 365. Therefore, trial counsel did not perform deficiently after the court sustained the State's objection.

¶63 However, even if we presume some deficient performance by trial counsel, Mannery's claim fails under the prejudice prong. The trial court concluded in its postconviction decision that there was "not a reasonable probability that the outcome of the trial would have been any different. The evidence against the defendant was completely overwhelming as borne out by the trial record, and the verdict would have been the same." In this regard, Mannery's allegations are conclusory. He relies upon several out-of-state decisions that

25

describe the dangers of crack cocaine use; however, he fails to develop an argument as to why the effects of crack cocaine would have made Alice unable to recall any events from this time period. As the trial court noted when it sustained the objection during trial, the issue of Alice's impairment had been raised. Mannery fails to demonstrate that further pursuit of Alice's crack cocaine use would have a reasonable probability of a different outcome of the trial.

¶64    The record reflects that the evidence against Mannery was overwhelming. As we discussed above, there was sufficient evidence to support the jury's guilty verdicts on six of the seven counts.[7] The trial court noted in its decision denying postconviction relief that Alice was "an extremely credible witness and very detail oriented. She remembered all the specifics of her relationship with [Mannery] and came across very believable to both the jury and the court." The record reflects that Alice provided extensive testimony about the repeated abusive and controlling behavior Mannery exhibited toward her and his role in the acts of prostitution. Further, Alice acknowledged her own behavioral issues including marijuana and alcohol use; therefore, Mannery's allegations are conclusory that evidence of crack cocaine use would have had a reasonable probability of changing the outcome of the trial.

¶65    Even if we assume without deciding that Mannery alleged sufficient material facts that trial counsel was deficient for failing to pursue prior inconsistent statements about cocaine with Alice, her mother, and her aunt, his

---

[7] Mannery did not challenge the sufficiency of the evidence for count two, soliciting a child for prostitution, in the Trafficking Case. Therefore, we do not interpret him to dispute the sufficiency of the evidence. We consider the evidence overwhelming on all counts in the combined cases.

allegations with regard to prejudice are conclusory, and ultimately, his claim of ineffective assistance of counsel fails. Further, the record conclusively demonstrates that Mannery cannot show prejudice to his defense from any deficiencies in trial counsel's performance. We conclude that he is not entitled to relief on his ineffective assistance of counsel claim and the trial court acted within its discretion to deny his motion without a hearing. *See Jackson*, 405 Wis. 2d 458, ¶8.

### III. *Presence during jury deliberation questions and answers*

¶66 Mannery's next argument is that his constitutional rights were violated because the trial court had communication with the jury outside of his and his trial counsel's presence during jury deliberations. He asserts that two questions from the jury were not answered on the record in open court and that the wrong evidence was released to the deliberating jurors.

¶67 Before we consider the merits of Mannery's claim, the State argues this claim is forfeited because of Mannery's failure to raise the issue during the trial or in postconviction proceedings. *See State v. Ndina*, 2009 WI 21, ¶29, 315 Wis. 2d 653, 761 N.W.2d 612 (explaining that forfeiture is a rule of judicial administration for the failure to make the timely assertion of a right); WIS. STAT. RULE 809.30(2)(h) (providing that a person must pursue postconviction relief in the trial court before "a notice of appeal is filed unless the grounds for seeking relief are sufficiency of the evidence or issues previously raised"). Mannery has not directed us to a point in the record where he previously raised this issue to the trial court. *See State v. Caban*, 210 Wis. 2d 597, 604, 563 N.W.2d 501 (1997) (holding that an appellant has the burden of showing where an issue was raised below). Nevertheless, we will address this claim on the merits to the extent that it

applies the right to counsel because the right to counsel is a constitutional protection that would need to be waived, not forfeited. *Ndina*, 315 Wis. 2d 653, ¶¶29-32. "Wisconsin courts have determined that voir dire, jury instructions, and jury deliberations constitute critical stages at which the right to counsel attaches." *State v. Spencer*, 2022 WI 56, ¶27, 403 Wis. 2d 86, 976 N.W.2d 383.

¶68   Next, we reject Mannery's argument to the extent that it relies upon a personal right of presence during these alleged jury interactions. Mannery claims that his right to be present during every important stage of the trial was violated, with a general legal reliance on the position that "[a] criminal defendant is entitled to be present at his trial and to have counsel at every stage where he needs aid in dealing with legal problems." *State v. Burton*, 112 Wis. 2d 560, 565, 334 N.W.2d 263 (1983), *overruled by State v. Alexander*, 2013 WI 70, 349 Wis. 2d 327, 833 N.W.2d 126. However, *Burton* was overruled. Our supreme court "stated [that] 'the presence of [a] defendant is constitutionally required only to the extent a fair and just hearing would be thwarted by his absence[.]'" *Alexander*, 349 Wis. 2d 327, ¶25 (quoting *Leroux v. State*, 58 Wis. 2d 671, 690, 207 N.W.2d 589 (1973)). Mannery has failed to show that his fair and just trial was thwarted by his alleged absence from these interactions.

¶69   Mannery alleges that the trial court answered two questions from the jury and released evidence to the jury during deliberations without his presence or without his counsel's presence. We turn to the record. First, the transcript reflects that two written questions were submitted by the jury during deliberations. After an on-the-record consultation with the parties—while Mannery was present in the

28

courtroom—the trial court wrote back answers to the jury.[8] Second, two additional written questions from the jury are shown in the appellate record: (1) asking to view evidence associated with the incident in count five; and (2) asking to see text conversations between Alice and her aunt regarding the incident in count five.[9] No written answers are recorded in reply to the questions. There is no reference to additional questions or answers in the transcript. Instead there is only a CCAP entry.[10] A CCAP entry from that trial date that stated: "Jury questions and responses placed on the record. Deliberations continue. Per stipulation of the parties, exhibits 1, 8-14 - released to the jury as requested." Exhibit one was the hotel registration alleged to be from the first night Mannery and Alice were together. Exhibits eight through fourteen were police investigation photographs taken of Alice in 2016. The exhibits were published to the jury during the trial.

¶70 The State argues that the lack of written answers and the lack of reference to these questions in the transcript supports that the trial court never

---

[8] The first question was the definition of cause in count three. After consultation and agreement with the parties, the court wrote back, "[u]se your common knowledge and understanding of the word." The second question was whether count five for physical abuse of a child applied to one specific incident or the entire time period. After consultation and agreement with the parties, the court wrote back, "Yes, it applies to the incident near Appleton and Silver Spring during the summer 2015."

[9] We note that while Alice's testimony referenced texts with her family and photographs of this incident, those texts and photographs were not admitted at trial and do not appear in the record.

[10] CCAP stands for Wisconsin's Consolidated Court Automation Programs, which displays information entered by court staff on a website interface. *Kirk v. Credit Acceptance Corp.*, 2013 WI App 32, ¶5 n.1, 346 Wis. 2d 635, 829 N.W.2d 522. "It is not the official record of a criminal case, as the clerks of court for each county are the officials responsible for those records." *State v. Bonds*, 2006 WI 83, ¶46, 292 Wis. 2d 344, 717 N.W.2d 133. However, we may take judicial notice of the CCAP records. *See* WIS. STAT. § 902.01; *Kirk*, 346 Wis. 2d 635, ¶5 n.1.

addressed these questions. The State asserts that Mannery's failure to raise this issue to the trial court should forfeit this claim because the trial court was in the position to determine whether there was an off-the-record conference or otherwise explain the decision to release the evidence.

¶71 Mannery argues that the existence of the questions proves that the court engaged in unpermitted *ex parte* communication with the jury. This argument is purely speculative. We instead agree with the State's position that the CCAP entry provides its own explanation. The CCAP entry states that the evidence was released to the jury "by stipulation." Such a stipulation would arise from agreement by the State and Mannery's counsel. Therefore, we can infer that Mannery's interests were represented by counsel during that discussion. If we accept that the stipulation covered the release of the evidence and all of the jury questions, then Mannery's claim fails for lack of factual basis for his allegation that he was denied the right to representation by counsel during the jury deliberations. This entry does not support that the trial court engaged in ex parte communication with the jury.

¶72 Additionally, Mannery argues that the "wrong evidence" was released to the jury. To reach this position, Mannery argues that the third and fourth written questions referred to count five, but the hotel receipt in exhibit one was not the location alleged in count five, and the photographs in exhibits eight through fourteen were not the pictures Alice texted her aunt in connection with the incident in count five. Mannery asserts that if counsel had been present, he would have had the opportunity to object to the release of these exhibits. Mannery contends that the release of these exhibits prejudiced his defense because it confused the jury if they had reason to believe that these exhibits related to count five. We conclude that Mannery's position that the released evidence

inappropriately connected the third and fourth questions is pure speculation. There is no proof that the release of these exhibits was related to the two unanswered, written jury questions. Mannery faced seven counts in the combined cases. The released evidence was relevant to the case overall and there are no material facts to support Mannery's allegations to the contrary.

¶73   The State argues that even if we assume that Mannery was deprived of his Sixth Amendment right to counsel with regard to the disposition of the two jury questions and the release of the evidence, the analysis would be subject to the harmless error standard. "A constitutional error is harmless if the [S]tate can prove beyond a reasonable doubt that it did not contribute to the verdict." *State v. Bjerkaas*, 163 Wis. 2d 949, 958, 472 N.W.2d 615 (Ct. App. 1991). The State argues that Mannery fails to develop a meaningful argument that the release of these exhibits contributed to the verdict on count five. There was ample evidence, as we explained above, to support that the jury could find that the State's proved all elements of count five. With the CCAP entry in support of a stipulation to the release of the exhibits, we are not persuaded that Mannery's constitutional rights were violated by that release because there is no evidence that he was denied the assistance of counsel. Therefore, we conclude any error related to Mannery's right to counsel during jury deliberations was harmless.

### IV.   *Cumulative trial errors*

¶74   Mannery argues that cumulative trial errors altered the course of his trial and violated his right of due process. "The cumulative effect of several errors may, in certain instances, undermine a reviewing court's confidence in the outcome of a proceeding." *State v. Harris*, 2008 WI 15, ¶110, 307 Wis. 2d 555, 745 N.W.2d 397. Mannery asks that we apply the federal "cumulative effect

analysis [that] requires a petitioner to establish two elements: (1) at least two errors were committed in the course of the trial; (2) considered together, along with the entire record, the multiple errors so infected the jury's deliberation that they denied the petitioner a fundamentally fair trial." *Alvarez v. Boyd*, 225 F.3d 820, 824 (7th Cir. 2000).

¶75 Wisconsin does not appear to have adopted this test; however, if we assume without deciding that the test is applicable, Mannery's claim still fails. The first step under the federal test is to assess whether errors occurred at trial. Mannery argues that it was an error that he was denied trial counsel's presence during the jury questions. This has been assessed above and we concluded any errors were harmless. However, Mannery further asserts that the jury deliberations were "fundamentally infected" by the prosecutor's closing argument, positing that the prosecutor made improper references throughout the closing argument, impermissibly vouched for the credibility of the witnesses, and made impermissible inferences based on other acts. We reject these claims because they are being raised for the first time on appeal. *See State v. Huebner*, 2000 WI 59, ¶10, 235 Wis. 2d 486, 611 N.W.2d 727 ("It is a fundamental principle of appellate review that issues must be preserved at the circuit court. Issues that are not preserved at the circuit court, even alleged constitutional errors, generally will not be considered on appeal."). Further, Mannery's allegations are conclusory and he has not provided a basis within the record for this court to review his claims. *See* WIS. STAT. RULE 809.19(1)(d).

¶76 The State responds that nothing Mannery argues had an impermissible effect on his trial or would undermine confidence in the verdict, even if viewed in a cumulative fashion. It quotes the Wisconsin Supreme Court,

"Adding them together adds nothing. Zero plus zero equals zero." ***Mentek v. State***, 71 Wis. 2d 799, 809, 238 N.W.2d 752 (1976).

¶77    Error may have occurred during Mannery's trial—the trial court's failure to record what happened with the additional jury questions or how it came about that the parties stipulated to the release of evidence. But even when we consider the issues raised in Mannery's arguments and our examination of the trial as a whole, we are not persuaded that Mannery has demonstrated cumulative or prejudicial effect from errors. *See **Harris***, 307 Wis. 2d 555, ¶110. Accordingly, we reject Mannery's claim that cumulative error affected the fundamental fairness of his trial or violated his right to due process.

## CONCLUSION

¶78    For the reasons stated above, we reject all of Mannery's arguments made in postconviction and on appeal regarding sufficiency of the evidence, ineffective assistance of counsel, his right to have counsel present during jury deliberations and jury questions, and cumulative error. We conclude that the trial court acted within its discretion to deny Mannery's postconviction motions without a hearing.

*By the Court.*—Judgments and orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.